# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PAMELA GELLER,

               Plaintiff,

      -v.-

ANDREW CUOMO, in his official capacity as Governor of the State of New York; BILL DE BLASIO, individually and in his official capacity as Mayor, City of New York, New York; and DERMOT SHEA, individually and in his official capacity as the Police Commissioner, City of New York, New York,

               Defendants.

Case No. 20-4653

Honorable Edgardo Ramos

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii-vi

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ...................................................................................................3

ARGUMENT ......................................................................................................................10

I.      Standard for Issuing a Preliminary Injunction ................................................12

II.     Plaintiff Is Likely to Succeed on the Merits of Her First Amendment Challenge............13

        A.      Plaintiff's Proposed Speech Is Protected by the First Amendment ......................14

        B.      The Challenged Restrictions Ban Speech in Traditional Public Forums..............16

        C.      The Challenged Restrictions Cannot Survive Constitutional Scrutiny.................17

                1.      The Challenged Restrictions Are Unlawful Content- and Viewpoint-Based Restrictions on Speech .....................................................................................17

                2.      The Challenge Restrictions Are Not Reasonable Time, Place, and Manner Restrictions on Speech .....................................................................................19

III.    Plaintiff Will Suffer Irreparable Harm in the Absence of Injunctive Relief.....................23

IV.     The Balance of Equities Tips Sharply in Favor of Granting the Injunction .....................24

V.      Granting the Injunction Is in the Public Interest................................................................24

CONCLUSION...................................................................................................................25

CERTIFICATE OF SERVICE ........................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*,
418 F.3d 600 (6th Cir. 2005) ........................................................................17, 23

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
880 F. Supp. 2d 456 (S.D.N.Y. 2012) ...............................................13, 14, 15, 25

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
889 F. Supp. 2d 606 (S.D.N.Y. 2012) ......................................................................25

*AT&T v. Winback & Conserve Program*,
42 F.3d 1421 (3d Cir. 1994) ....................................................................................13

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...................................................................................................14

*Bay Area Peace Navy v. United States*,
914 F.2d 1224 (9th Cir. 1990) .................................................................................23

*Beal v. Stern*,
184 F.3d 117 (2d Cir. 1999) ............................................................................14, 20

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ..................................................................................24

*Boos v. Barry*,
485 U.S. 312 (1988) .................................................................................................15

*Cantwell v. Conn.*,
310 U.S. 296 (1940) .................................................................................................12

*Carey v. Brown*,
447 U.S. 455 (1980) .................................................................................................15

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................................................19

*City of Boerne v. Flores*,
521 U.S. 507 (1997) .................................................................................................19

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ...................................................................................................22

*City of Los Angeles v. Preferred Communications, Inc.*,
  476 U.S. 488 (1986)..................................................................................21

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984)..................................................................................20

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 1998) ....................................................................13

*Connick v. Myers*,
  461 U.S. 138 (1983)..................................................................................15

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
  473 U.S. 788 (1985)..................................................................................16

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
  70 F.3d 1474 (6th Cir. 1995) ....................................................................25

*De Jonge v. Oregon*,
  299 U.S. 353 (1937)............................................................................. 15-16

*Deeper Life Christian Fellowship, Inc. v. Board of Educ.*,
  852 F.2d 676 (2d Cir. 1988)......................................................................24

*Elrod v. Burns*,
  427 U.S. 347 (1976)............................................................................. 23-24

*Eclipse Enters. v. Gulotta*,
  134 F.3d 63 (2d Cir. 1997)........................................................................19

*Emp't Div. v. Smith*,
  494 U.S. 872 (1990)..................................................................................11

*Ex parte Milligan*,
  71 U.S. (4 Wall.) 2 (1866) ..........................................................................3

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) .................................................................................20

*Frisby v. Schultz*,
  487 U.S. 474 (1988)..................................................................................16

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
  23 F.3d 1071 (6th Cir. 1994) ....................................................................25

*Glendale Assocs. v. NLRB*,
    347 F.3d 1145 (9th Cir. 2003) ............................................................18

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...........................................................25

*Hague v. CIO*,
    307 U.S. 496 (1939) ....................................................................... 16-17

*Housing Works, Inc. v. Kerik*,
    283 F.3d 471 (2d Cir. 2002) .........................................................16, 20

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11 (1905) .................................................................... 2, 10, 11

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ..........................................................................17

*Lebron v. Wash. Metro. Area Transit Auth.*,
    749 F.2d 893 (D.C. Cir. 1984) ...........................................................14

*McCullen v. Coakley*,
    573 U.S. 464 (2014) .............................................................17, 18, 20

*Members of the City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ..........................................................................21

*Metro. Taxicab Bd. of Trade v. City of N.Y.*,
    615 F.3d 152 (2d Cir. 2010) ..............................................................13

*Million Youth March, Inc. v. Safir*,
    18 F. Supp. 2d 334 (S.D.N.Y. 1998), *modified in part by* 155 F.3d 124 (2d Cir 1998) ..........20

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ..........................................................................21

*NAACP v. City of Richmond*,
    743 F.2d 1346 (9th Cir. 1984) ...........................................................23

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ..........................................................................15

*Nat'l Grp. for Communs. & Computers Ltd. v. Lucent Techs. Int'l Inc.*,
    331 F. Supp. 2d 290 (D.N.J. 2004) ................................................ 20-21

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976)......................................................................................14

*Newsom v. Norris,*
    888 F.2d 371 (6th Cir. 1989) ......................................................................24

*N.Y. Magazine v. Metro. Transp. Auth.,*
    136 F.3d 123 (2d Cir. 1998)...................................................13, 14, 16, 24

*Olivieri v. Ward,*
    766 F.2d 690 (2d Cir. 1985)................................................................20-21

*Olivieri v. Ward,*
    801 F.2d 602 (2d Cir. 1986)........................................................................21

*Papineau v. Parmley,*
    465 F.3d 46 (2d Cir. 2006).....................................................................15-16

*Perry Educ. Ass'n v. Perry Local Educators,*
    460 U.S. 37 (1983)......................................................................................17

*Phillips v. City of New York,*
    775 F.3d 538 (2d Cir. 2015)........................................................................12

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992)......................................................................................2

*Police Dep't of the City of Chi. v. Mosley,*
    408 U.S. 92 (1972)......................................................................................18

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)................................................................................19

*Roberts v. Neace,*
    958 F.3d 409 (6th Cir. 2020) ........................................................2, 10, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)................................................................................17-18

*Saieg v. City of Dearborn,*
    641 F.3d 727 (6th Cir. 2011) ......................................................................22

*Schneider v. State,*
    308 U.S. 147 (1939)................................................................................15, 17

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)........................................................................14

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012)..............................................................13

*South Bay United Pentecostal Church v. Newsom*,
    No. 19-A1044, 590 U.S. ___ (May 29, 2020) ............................ 11-12

*Sterling v. Constantin*,
    287 U.S. 378 (1932)........................................................................2

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002)..........................................................24

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007)............................................................16

*Terminiello v. Chicago*,
    337 U.S. 1 (1949) ..................................................................... 20-21

*Thomas v. Chic. Park Dist*,
    534 U.S. 316 (2002)......................................................................20

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)................................................................17, 18

*United States v. Nat'l Treasury Emples. Union*,
    513 U.S. 454 (1995)...................................................................2-3

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 12-13

OTHER

http://www.primaltherapy.com/what-is-primal-therapy.php .........................................................2

# INTRODUCTION

"***Liberty once lost is lost forever***." – John Adams

This case seeks to protect and vindicate fundamental liberties that citizens of the United States enjoy free from government interference.  These liberties are not conferred or granted by government to then be rescinded at the will and whim of government officials.  These liberties, endowed by our Creator, are possessed by the people, and they are guaranteed against government interference by the United States Constitution, which is the supreme law of the land.  First among these liberties is the right to peacefully protest government officials through the freedom of speech and the right to peaceably assemble with others of like mind, both of which are guaranteed by the First Amendment.

The right to freedom of speech is not a right to catharsis.  It is a right to meaningfully protest and assemble in public in order to change public policy.  The most effective way to exercise this right is to organize and participate in a *public* protest as a group—there is no adequate alternative to this method of expressing opposition to the government, its officials, and their policies.  Our nation's history and experience with the civil rights movement bear this out, as do the recent protests surrounding the death of George Floyd—protests that are embraced, supported, and encouraged by Defendants.

Defendants, through the adoption and enforcement of executive edicts, have suspended the fundamental right to freedom of speech and to peaceably assemble in the City of New York for some protestors, including Plaintiff Geller, but not others in direct violation of the First and Fourteenth Amendments.

Through this lawsuit, Plaintiff Geller challenges Defendants' selective suspension of the First Amendment.  There is no justification—neither the fear of a pandemic nor public outcry over

police brutality—for a government official to revoke this fundamental right for some of the people, but not for others.  Indeed, there is neither a pandemic nor "primal therapy"[1] exception to the fundamental liberties guaranteed by the Constitution.   And *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), does not provide one.  The Sixth Circuit recently affirmed this point.  *See Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (granting injunction to enjoin the Kentucky governor's restriction on the free exercise of religion during the current pandemic).  Indeed, *Jacobson* affirms the crucially important role of the judiciary (this Court) to ensure that such an exception <u>never</u> exits.  Per the Supreme Court: "[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, *or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge*, *and thereby give effect to the Constitution*."  *Jacobson*, 197 U.S. at 31 (emphasis added).  If this Court were to accept Defendants' position, then it is the fiat of the Governor and Mayor, and not the Constitution, that is the supreme law of the land.  *Cf. Sterling v. Constantin*, 287 U.S. 378, 397–98 (1932) ("If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases[.]"); *see also Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992) (citing *Jacobson* for the proposition that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims"); *see generally United States v. Nat'l Treasury Emples. Union*, 513 U.S. 454, 475 (1995) ("Fear of serious injury cannot alone justify suppression

---

[1] A form of psychotherapy that suggests a need to find the source of early repressed trauma and, once discovered, to give it voice, oftentimes through screaming.  *See* http://www.primaltherapy.com/what-is-primal-therapy.php (last accessed June 23, 2020).

of free speech and assembly.  Men feared witches and burnt women.") (internal quotations and citation omitted); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 121 (1866) ("No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.  Such a doctrine leads directly to anarchy or despotism. . . .").

Here, Defendants seek a "plenary override of individual liberty claims" through the enforcement of executive orders.  What raises the alarm of governmental overreach to the level of an immediate constitutional crisis is the application of this executive override in favor of one particular message demanded by one group, large though it may be, but not for others whose messages per the Mayor and Governor are less pressing.  The Court should forbid this patently biased attempt to refashion the First Amendment and grant Plaintiff's motion.

## STATEMENT OF FACTS

### Defendant Cuomo Issues Orders Restricting First Amendment Rights

Pursuant to his authority as Governor, Defendant Cuomo is empowered to issue executive orders.  A violation of an executive order can result in a civil or criminal penalty.  On or about March 23, 2020, Defendant Cuomo issued Executive Order ("EO") No. 202.10, which took effect immediately and remained in effect pursuant to Section 29-a of Article 2-B of the Executive Law of the State of New York for 30 days unless it was terminated or modified at an earlier date.  EO No. 202.10 ordered, in relevant part, that "[n]on-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other social events) are canceled or postponed at this time." From April 7, 2020 through May 8, 2020, Defendant Cuomo issued various EOs extended the restriction against "non-essential gatherings" through June 7, 2020.  (Geller Decl. at ¶¶ 11-16).

On May 21, 2020, Defendant Cuomo issued EO No. 202.32, which modified EO 202.10

"to permit a gathering of ten or fewer individuals for any religious service or ceremony, or for the purposes of any Memorial Day service or commemoration." On May 22, 2020, Defendant Cuomo issued EO No. 202.33, which modified EO 202.32 "to permit any non-essential gathering of ten or fewer individuals, for any lawful purpose or reason." From May 29, 2020 through June 13, 2020, Defendant Cuomo issued EOs extending the modified restriction (*i.e.*, 10-person limitation) on "non-essential gatherings" until July 13, 2020. (Geller Decl. at ¶¶ 17-20).

On June 15 2020, Defendant Cuomo issued EO No. 202.42, which modified EO 202.41 by extending its effective date until July 15, 2020, and by "allow[ing] twenty-five (25) or fewer individuals, for any lawful purpose or reason, provided that the location of the gathering is in a region that has reached Phase 3 of the State's reopening." At the time of the filing of this motion, the City of New York remains in Phase 1 of the State's reopening plan and is subject to EO 202.41's prohibition restricting non-essential group activities, including protests in public fora, to "ten or fewer individuals." (Geller Decl. at ¶¶ 21-22).

**Defendant de Blasio Issues Orders Restricting First Amendment Rights**

Pursuant to his authority as Mayor, Defendant de Blasio is empowered to issue emergency executive orders. A violation of an emergency executive order can result in a civil or criminal penalty. Pursuant to his authority as Police Commissioner, Defendant Shea is empowered and required to enforce Defendant de Blasio's emergency executive orders and Defendant Cuomo's executive orders via the City's police force. (Geller Decl. at ¶¶ 23-24).

On or about March 25, 2020, Defendant de Blasio issued Emergency Executive Order ("EEO") No. 103, which took effect immediately and remained in effect for five (5) days unless terminated or modified at an earlier date. EEO No. 103 ordered that "any non-essential gatherings of individuals of any size for any reason shall be cancelled or postponed." Through a series of

executive orders issued beginning on March 30, 2020, and continuing every five days throughout the month of April, Defendant de Blasio extended the restriction on "non-essential gatherings" for an additional five days.  On May 4, 2020, Defendant de Blasio issued EEO No. 111, which again extended the restriction on "non-essential gatherings" for an additional five days.  (Geller Decl. at ¶¶ 25-28).

Prior to May 4, 2020, Defendants had never made any public statement or issued any official or unofficial clarification that the restriction on "non-essential gatherings" would apply to prohibit otherwise lawful free speech activity.  During a press conference held on May 4, 2020, Defendants de Blasio and Shea publicly and officially announced that the "shut down" imposed by the executive orders included the suspension of the right to publicly protest in the City.  In other words, free speech activity was considered a "non-essential gathering" and thus prohibited.  (Geller Decl. at ¶¶ 29-30).

The May 4, 2020, press conference announcement by Defendants de Blasio and Shea was prompted by a question relating to a small group of protestors who were instructed by New York City police to disband and who were threatened by the police with summonses and arrest if they failed to disband.  Upon information and belief, the reporting of this event on May 4, 2020, was the first public report of Defendants de Blasio and Shea enforcing the executive orders against individuals peaceably assembling for the purpose of public protest.  Through a series of executive orders issued beginning on May 9, 2020, and continuing every five days through May 24, 2020, Defendant de Blasio extended the restriction on "non-essential gatherings" for an additional five days.  On May 29, 2020, Defendant de Blasio issued EEO No. 115, which extended the restriction on "non-essential gatherings" for an additional five days and modified it in relevant part as follows: "[A]ny non-essential gathering of individuals of any size for any reason shall be cancelled or

postponed, provided however that gatherings of ten (10) or fewer individuals where such individuals adhere to applicable social distancing protocols and cleaning and disinfection protocols are permitted."  Through a series of executive orders issued beginning on June 3, 2020, and continuing approximately every five days through June 17, Defendant de Blasio extended the modified restriction on "non-essential gatherings" for an additional five days.  (Geller Decl. at ¶¶ 31-34).

The purpose and effect of the restrictions on "non-essential gatherings"—the challenged First Amendment restrictions—were, and continue to be, to shut down most of the City and the State of New York for certain protest activity.  Defendants' stated rationale for the "shut down" and thus the challenged restrictions has been, and continues to be, to stop the spread of COVID-19 and to "flatten the curve" of infection, hospitalization, and mortality rates related to COVID-19.  Defendants Cuomo and de Blasio intend to issue additional executive orders over the coming weeks and months that will continue the "shut down" and thus continue the challenged First Amendment restrictions.  Further, Defendants Cuomo and de Blasio intend to lessen or increase the "shut down" and thus First Amendment restrictions in the future depending upon their respective views of the severity of the COVID-19 infection, hospitalization, and mortality rates in New York. (Geller Decl. at ¶¶ 35-37).

Prior to the May 4, 2020 announcement by Defendants de Blasio and Shea that Defendant de Blasio's executive orders prohibit lawful, free speech activity throughout the City, Plaintiff was planning public protests of Defendant de Blasio's draconian restrictions imposed during this current pandemic.  Plaintiff was planning to protest throughout the months of May and July, and as long as the restrictions continued, in public fora throughout the City.  She was planning protests of approximately 25 to 100 people to take place primarily at City Hall Plaza, the seat of City

government.  As a result of the challenged First Amendment restrictions, Plaintiff had to cease and cancel her planned protests, thus causing her irreparable harm.  Subsequently, Defendant Cuomo has also taken the formal position in litigation that his executive orders also prohibit lawful, free speech activity throughout the State.  (Geller Decl. at ¶¶ 39-40).

### Defendants Encourage New York City Protests Violating the First Amendment Restrictions Based Upon the Content and Viewpoint of the Message

Apparently sparked by the death of George Floyd while in police custody in Minneapolis, Minnesota, beginning on May 28, 2020, and continuing daily through the current month of June 2020, hundreds and thousands of protestors have taken to the streets of New York City protesting what they allege to be police brutality against Blacks and what is referred to as systemic racism, and calling for various reforms.  (Geller Decl. at ¶ 41).

Notwithstanding the First Amendment restrictions in place at the time and their enforcement by Defendants against other New Yorkers engaged in public group activity, including activity protected by the First Amendment's right to freedom of speech and to peaceably assemble, Defendants have embraced the content and viewpoint of these protestors' message and have encouraged the demonstrations and protests (hereinafter referred to as "government-approved protests").  For example, on June 1, 2020, just four days after the start of the government-approved protests, Defendants Cuomo and de Blasio issued a press release with the following quoted statements:

> "I support and protect peaceful protest in this city.  The demonstrations we've seen have been generally peaceful.  **We can't let violence undermine the message of this moment.  It is too important and the message must be heard**.  Tonight, to protect against violence and property damage, the Governor and I have decided to implement a citywide curfew," said Mayor Bill de Blasio.   "The Police Commissioner and I have spoken at length about the incidents we've all seen in recent days where officers didn't uphold the values of this city or the NYPD.  We agree on the need for swift action.  He will speak later today on how officers will be held accountable."

> "**I stand behind the protestors and their message**, but unfortunately there are people who are looking to take advantage of and discredit this moment for their own personal gain," said Governor Cuomo.  "The violence and the looting that has gone on in New York City has been bad for the city, the state and this entire national movement, undermining the and distracting from this righteous cause.  **While we encourage people to protest peacefully and make their voices heard**, safety of the general public is paramount and cannot be compromised.  At the same time, we are in the midst of a global pandemic which spreads through crowds and threatens public health.  Tonight the Mayor and are implementing a citywide curfew starting at 11 PM and doubling the NYPD presence across the city."

(Geller Decl. at ¶¶ 42-43).

Beyond the verbal praise of the protestors who were openly and massively violating the challenged First Amendment restrictions, it was widely reported that high ranking New York City police officers actually participated in the protests by kneeling with protestors and holding hands with other protestors while not wearing any face coverings or gloves.  Social distancing was also disregarded.  The below photograph is but one of many examples:



This picture is captioned as follows:

> Chief of Department of the New York City Police, Terence Monahan, takes a knee with activists as protesters paused while walking in New York, Monday, June 1, 2020.  Demonstrators took to the streets of New York to protest the death of George Floyd, who died May 25 after he was pinned at the neck by a Minneapolis police officer. (AP Photo/Craig Ruttle).

(Geller Decl. at ¶ 44).

Chief Monahan's conduct pictured above violates Defendant de Blasio's and Defendant Cuomo's executive orders prohibiting "non-essential gatherings" consisting of more than 10 people and the executive orders requiring social distancing in public, and it violates Defendant Cuomo's Executive Order 202.17 requiring face coverings in public settings when social distancing cannot be observed.

Notwithstanding the blatant violations of the executive orders and, in particular, the challenged First Amendment restrictions, Defendant de Blasio enthusiastically endorsed Chief Monahan's conduct:

> Terry Monahan made the point out in Washington Square Park, anyone who hasn't seen that video of Terry Monahan in Washington Square Park needs to see it, it is a profound moment. **Don't just see the part where he kneels down, see what he says.  And he's saying, pure passion from the heart, and he points to the officers around us, and he says none of us believe what happened in Minnesota was right.  And it was a very important moment, it was a watershed moment to me,** and I think we need this going forward, that police leaders, police officers, I'd like to see police unions even say, when something is done wrong in policing, we are all going to own it.  We all want to fix it together.

(Geller Decl. at ¶ 46).  And yet again five days later:

> Chief Monahan, I spoke to him throughout this.  I constantly was in touch with Commissioner Shea, Chief Monahan, Chief Pichardo.  We constantly compared notes.  And I want to say again, Chief Monaghan in Washington Square Park did something that I hope will be respected.  The highest ranking uniformed officer in the largest, most important police force in America – he spoke to the protesters.  He said, none of us condoned and can accept what happened, that those officers did in Minnesota, and we are all in this together and we have to bring our city forward together.  **And then they said, show us some respect, take a knee with us, and he did.  It was a powerful, meaningful moment.  And for all the things that need to be better, we also have to remember the things that were right, and that was something right**.

(Geller Decl. at ¶ 46).

**Plaintiff's First Amendment Activity Restricted**

Prior to the May 4, 2020, press conference, Plaintiff had understood that First Amendment

activity, specifically including peaceful public protests in public fora within the City, was not

forbidden by either Defendant Cuomo's executive orders or Defendant de Blasio's emergency

executive orders insofar as she assumed such activity was considered "essential" to a free society

and thus not within the scope of the restrictions.  Consequently, prior to May 4, 2020, Plaintiff had

planned for and begun to organize participation in upcoming public protests of Defendant de

Blasio's policies, including the draconian restrictions he had imposed upon businesses, religious

worship, and other fundamental liberties during the COVID-19 pandemic.  The protest was to

include between 25 and 100 people standing silently in City Hall Plaza with face coverings,

observing social distancing protocols, and holding signs conveying their protest message.  Upon

learning of Defendant de Blasio's and Shea's position that public protests were considered non-

essential activity and thus forbidden under the executive orders, Plaintiff cancelled her planned

protests.  But for the challenged First Amendment restrictions, Plaintiff would have organized and

participated in several public protests, with each protest including between 25 and 100 people.

(Geller Decl. at ¶¶ 47-50).

## ARGUMENT

Neither *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), nor this current

pandemic prevents this Court from declaring the challenged restrictions unlawful and enjoining

their enforcement—now and in the future.  As recently stated by the Sixth Circuit, "While the law

may take periodic naps during a pandemic, we will not let it sleep through one."  *Roberts*, 958

F.3d at 414-15 (granting a preliminary injunction under the First Amendment and enjoining the

enforcement of Kentucky's ban on "mass gatherings" during the current pandemic as applied to

in-person church attendances).

In *Jacobson*, amid a smallpox outbreak, a city (acting pursuant to a state statute) mandated

the vaccination of all of its citizens.  The Court upheld the statute against a Fourteenth Amendment

challenge, clarifying that the State's action was a lawful exercise of its police powers and noting

that, "[u]pon the principle of self-defense, of paramount necessity, a community has the right to

protect itself against an epidemic of disease which threatens the safety of its members."  *Id.* at 27.

While the Court in *Jacobson* urges deferential review in times of emergency, it clearly demands

that the courts enforce the Constitution.  *See id.* at 28.  Indeed, the Court explicitly contemplates

an important and essential backstop role for the judiciary.  *See id*. at 31 (acknowledging that during

a public health crisis the courts have the "duty" to "give effect to the Constitution").

Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it

impinges on a fundamental right in a "plain, palpable" way or has "no real or substantial relation"

to the public safety concerns at issue.  *Id.* at 31.  Accordingly, per *Jacobson*, requiring a vaccination

for a disease that is the *source* of the public emergency is directly related to the government's

public safety concerns.  The same is not true of the challenged restrictions at issue here.

Moreover, nothing in *Jacobson* supports the view that an emergency *displaces* normal

constitutional standards.  Rather, *Jacobson* provides that an emergency may justify temporary

constraints *within* those standards.[2]  As the Second Circuit observed, *Jacobson* merely rejected

---

[2] The Supreme Court's denial of an injunction in *South Bay United Pentecostal Church v. Newsom*,
No. 19-A1044, 590 U.S. ___ (May 29, 2020), is not to the contrary.  *South Bay United Pentecostal
Church* presented a challenge under the Free Exercise Clause and not the Free Speech Clause.
That is significant.  Under extant free exercise jurisprudence, "the right of free exercise does not
relieve an individual of the obligation to comply with a valid and neutral law of general
applicability."  *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990).  The *principal* difference between
the Chief Justice's concurrence and Justice Kavanaugh's dissent was the Chief Justice's
conclusion that the restriction was a valid and neutral law of general applicability:

Although California's guidelines place restrictions on places of worship, *those
restrictions appear consistent with the Free Exercise Clause of the First
Amendment*.  Similar or more severe restrictions apply to comparable secular

- 11 -

what would now be called a "substantive due process" challenge to a compulsory vaccination requirement, holding that such a mandate "was within the State's police power." *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) (observing that "*Jacobson* did not address the free exercise of religion because, at the time it was decided, the Free Exercise Clause of the First Amendment had not yet been held to bind the states") (citing *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940)). *Jacobson* does not give license to government officials to broadly suspend the Constitution during a public health crisis. *See Roberts*, 958 F.3d at 414-16 (acknowledging *Jacobson*, applying a traditional free exercise analysis in a challenge to the Kentucky governor's executive order issued during the pandemic, and enjoining the challenged provision).

## I.     Standard for Issuing a Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

---

gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently *only dissimilar activities*, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

(Roberts C.J. at 2) (emphasis added). As a result, deference to California was in order. Justice Kavanaugh, however, concluded that the restriction *discriminated* against religion (*i.e.,* it was not a neutral law of general applicability). Therefore, California had to satisfy strict scrutiny, which it could not, *even in light of the current pandemic*:

What California needs is a compelling justification for distinguishing between (i) religious worship services and (ii) the litany of other secular businesses that are not subject to an occupancy cap. California has not shown such a justification.

(Kavanaugh, J., at 2). Free Exercise jurisprudence is not controlling here. Nonetheless, the Court's order makes clear that constitutional standards do apply during this current pandemic.

- 12 -

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) ("In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor."); *see also Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 465 (S.D.N.Y. 2012) ("*AFDI v. MTA I*") (noting that a mandatory preliminary injunction requires a "clear showing that the moving party is entitled to the relief requested").

Additionally, because the requested injunction seeks to protect Plaintiff's First Amendment rights to freedom of speech and to peaceably assemble, the crucial and often dispositive factor is whether Plaintiff is likely to prevail on the merits. *See N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."); *see generally AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.").

## II.    Plaintiff Is Likely to Succeed on the Merits of Her First Amendment Challenge.

Plaintiff's First Amendment claim is reviewed in three steps.   First, the Court must determine whether the speech in question—Plaintiff's political protest—is protected speech.

Second, the Court must conduct a forum analysis as to the forums in question to determine the proper constitutional standard to apply.  And third, the court must then determine whether the challenged restrictions comport with the applicable standard.  *AFDI v. MTA I*, 880 F. Supp. 2d at 466 (analyzing a free speech claim in "three parts").

Moreover, the challenged restrictions are "an exercise of a prior restraint." *N.Y. Magazine*, 136 F.3d at 131.  "The essence of prior restraints is that they give public officials *the power to deny use of a forum in advance of actual expression*." *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999) (citing *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)) (emphasis added).  Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  "*Any system of prior restraints of expression* comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases) (emphasis added); *see also Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) (Bork, J.) (stating that the transit authority "carries a heavy burden of showing justification for the imposition of [a prior] restraint") (internal quotation marks and citation omitted).

Here, Defendants have exerted their power to deny Plaintiff and her co-protestors the use of any public forum within the City for her core political speech in advance of the expression. Defendants have made no provisions to permit expressive activity even if the protestors exercise appropriate social distancing measures—*unless* the protest is conveying a message regarding racial inequality following the death of George Floyd—and in that case, not even social distancing matters.

- 14 -

**A.      Plaintiff's Proposed Speech is Protected by the First Amendment.**

The first question is easily answered.  Plaintiff's proposed political protest comes within the ambit of speech fully protected by the First Amendment.  As stated by the Supreme Court, "speech on public issues," such as Plaintiff's planned protest of Mayor de Blasio's and Governor Cuomo's policies, "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)).  Indeed, Plaintiff's speech is "core political speech," which "is afforded the highest level of protection under the First Amendment."  *AFDI v. MTA I*, 880 F. Supp. 2d at 466 ("As a threshold matter, the Court notes that the AFDI Ad is not only protected speech—it is core political speech. . . . As such, the AFDI Ad is afforded the highest level of protection under the First Amendment.").

As the Supreme Court has long observed:

> This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties.  The phrase is not an empty one and was not lightly used.  *It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men*.  It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.

*Schneider v. State*, 308 U.S. 147, 161 (1939) (emphasis added).  As noted by the Second Circuit:

> The Supreme Court has declared that the First Amendment protects political demonstrations and protests - activities at the heart of what the Bill of Rights was designed to safeguard.  *See Boos v. Barry*, 485 U.S. 312, 318 (1988) (calling organized political protest "classically political speech" which "operates at the core of the First Amendment").  Indeed, the Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder.

*Papineau v. Parmley,* 465 F.3d 46, 56 (2d Cir. 2006); *see also De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to those of free speech and free

press and is equally fundamental."); *see also Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007)

"The First Amendment declares in part that 'Congress shall make no law . . . abridging the freedom

of speech . . . or the right of the people peaceably to assemble.'  U.S. Const. amend. I.  The

Amendment embodies and encourages our national commitment to robust political debate by

protecting both free speech and associational rights.")

### B.    The Challenged Restrictions Ban Speech in Traditional Public Forums.

"The [Supreme] Court has adopted a forum analysis as a means of determining when the

Government's interest in limiting the use of its property to its intended purpose outweighs the

interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP*

*Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided

government property into three categories: traditional public forums, designated public forums,

and nonpublic forums.  *Cornelius,* 473 U.S. at 800; *N.Y. Magazine*, 136 F.3d at 128 ("The Supreme

Court has created three categories of government property, and announced standards for reviewing

government restriction of speech according to those categories.").  Once the forum is identified,

the court must then determine whether the speech restriction is justified by the requisite standard.

*Id.*

Without question, the challenged restrictions ban speech and assembly in traditional public

forums.  *Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988) ("[A]ll public streets are held in the public

trust and are properly considered traditional public fora.") (internal citation omitted); *see also*

*Hous. Works v. Kerik*, 283 F.3d 471, 478 (2d Cir. 2002) ("City Hall Plaza is a public forum as

defined by the Supreme Court.").  Traditional public forums, such as streets, sidewalks, and parks,

are places that "have immemorially been held in trust for the use of the public and, time out of

mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939).

As stated by the Supreme Court, "[T]he streets are natural and proper places for the dissemination of information and opinion, and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider*, 308 U.S. at 163; *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) (striking down a city ordinance and stating, "Constitutional concerns are heightened further where, as here, the [challenged ordinance] restricts the public's use of streets and sidewalks for political speech"); *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 55 (1983) ("In a public forum . . . all parties have a constitutional right of access . . . .").

C.   **The Challenged Restrictions Cannot Survive Constitutional Scrutiny.**

1.   **The Challenged Restrictions Are Unlawful Content- and Viewpoint-Based Restrictions on Speech.**

"[T]he guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force in a traditional public forum." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (internal quotations and citation omitted).   Per the Supreme Court, "Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

"The principle that has emerged from [Supreme Court] cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (internal quotations and citation omitted); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of

content discrimination.  The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").

A regulation "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (internal quotations and citation omitted); *see also Glendale Assocs. v. NLRB*, 347 F.3d 1145, 1155 (9th Cir. 2003) ("A rule is defined as a content-based restriction on speech when the regulating party must examine the speech to determine if it is acceptable.").  "[T]he 'principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Turner Broad. Sys.*, 512 U.S. at 642 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Here, Defendants approve, permit, and thus agree with the protestors who are protesting the death of George Floyd.  Defendants have publicly approved these recent protests, stating, *inter alia*, that the protests are "too important and the message must be heard," that they "stand behind the protestors and their message," and that they "encourage people to protest peacefully and make their voices heard."  (Geller Decl. at ¶ 43).  Yet, Defendants prohibit other protest activity, specifically including Plaintiff's proposed protest.  This is not only a content-based restriction in a public forum—it is a restriction based on viewpoint.  Accordingly, it must survive strict scrutiny, which it cannot.

"A content-based restriction on speech is presumptively invalid.  [To survive strict scrutiny, Defendants] must show that the [challenged restriction] is *necessary* to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Eclipse Enters. v. Gulotta*, 134 F.3d 63, 67 (2d Cir. 1997) (internal quotations and citation omitted) (emphasis added); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws . . . are presumptively unconstitutional.").  Strict scrutiny is "the most demanding test known to constitutional law."  *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Defendants cannot meet their burden under this "most demanding test" as a matter of law based on the fact that Defendants permit, without social distancing or other protective measures, such as the wearing of masks, the government-approved protests but prohibit all other public protests.  Additionally, Defendant de Blasio has implemented the Open Streets initiative, thereby permitting cyclist and others to use the City streets for activity that is not constitutionally protected. (Geller Decl. at ¶ 38).  These exceptions are fatal to the challenged restrictions.  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal quotations and citation omitted).  Indeed, a "narrowly drawn" restriction would permit, at a minimum, protest activity on the City streets and in other public forums under the same conditions as the government-approved protests or under the conditions that permit individuals to use the City streets and other public forums for recreational activity.

### 2.   The Challenged Restrictions Are Not Reasonable Time, Place, and Manner Restrictions on Speech.

Even if we were to ignore the government-approved protests—stretching credulity well beyond its breaking point—and assume *arguendo* that the challenged restrictions on free speech

activity are content neutral, they must be reasonable time, place, and manner restrictions that further a significant government interest. *See Ward*, 491 U.S. at 791; *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984); *Housing Works, Inc. v. Kerik*, 283 F.3d 471, 479 (2d Cir. 2002).   "Content-neutral time, place, and manner restrictions are permitted so long as they are 'narrowly tailored to serve a significant government interest, leave open ample alternatives for communication,' and do 'not delegate overly broad licensing discretion' to government officials." *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)); *see also Ward*, 491 U.S. at 791.   Defendants have the burden of establishing that the challenged restrictions are a legitimate, content-neutral, time, place, and manner regulation.  *See Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 346 (S.D.N.Y. 1998), *modified in part by* 155 F.3d 124 (2d Cir 1998); *see also Thomas v. Chic. Park Dist*, 534 U.S. 316 (2002).  This standard is not a pushover.  *See McCullen*, 573 U.S. at 495 ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.").

The Second Circuit has explained and underscored the trial court's role in examining the government's rationale for imposing time-place-manner restrictions:

> A court's power to review government restrictions imposed on the exercise of a First Amendment right occupies middle ground between extremes.  It does not kowtow without question to agency expertise, nor does it dispense justice according to notions of individual expediency "like a kadi under a tree."[3]   *Terminiello v.*

---

[3] The quote from Justice Frankfurter's opinion in *Terminiello*, oft quoted by lower courts, references an Islamic judge.  The context of the quote is the fact that Islamic law does not permit precedent to bind a judge.  Each ruling, even by the same judge, is independent of all previous rulings.  *See, e.g., Nat'l Grp. for Communs. & Computers Ltd. v. Lucent Techs. Int'l Inc*., 331 F. Supp. 2d 290, 295 (D.N.J. 2004) ("When a Saudi Arabian judge, known as a 'qadi,' attempts to resolve disputes, his decision must be in accordance with the Shari'a.  Therefore, he will turn to

> *Chicago*, 337 U.S. 1, 114 (1949) (Frankfurter, J., dissenting). "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine." *Olivieri v. Ward*, 766 F.2d 690, 691 (2d Cir. 1985). The district court performed that sorting process by means of the full trial that it conducted and the thorough opinion it handed down.
>
> When First Amendment concerns are involved a court "'may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.'" *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488 (1986) (quoting with approval *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22 (1984)). When reviewing the reasonableness of time, place and manner restrictions on First Amendment rights, a court must independently determine the rationality of the government interest implicated and whether the restrictions imposed are narrowly drawn to further that interest. In the instant case, we agree with the district court that the restrictions imposed were not drawn solely to further the government's conceded interest in public safety.

*Olivieri v. Ward*, 801 F.2d 602, 606 (2d Cir. 1986). Accordingly, this Court must play an active and probing role in testing any underlying factual assertions serving as Defendants' basis for imposing the ban on First Amendment rights (for some messages and not for others) in the City. Indeed, it is Defendants' burden to justify the restriction on First Amendment rights—it is not Plaintiff's burden to justify her liberty.

Trying to mitigate the harm of the current COVID-19 pandemic is a substantial government interest. But that does not end the inquiry, it only begins it. *See generally Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983) (stating that the Court has "long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment"). The ban on Plaintiff's free speech activity (but not on others' free speech activity) in every public forum in the City is not a narrowly

---

the aforementioned Qur'an, the Sunnah, and fiqh to guide his legal determination. Saudi Arabian judges are not bound by judicial precedent (in fact, Saudi Arabian judicial opinions are not published) and the concept of *stare decisis* does not exist.") (parenthetical in the original) (citations omitted).

drawn restriction.  For example, Defendant de Blasio has implemented the Open Streets initiative

whereby certain City streets are open to pedestrians and cyclists. (Geller Decl. at ¶ 38).  However,

these same City streets remain closed for First Amendment protest activity even if the protestors

maintain proper social distancing.  But more to the point, Defendants endorse and promote the

government-approved protests surrounding the death of George Floyd, but prohibit Plaintiff's

protests.  The First Amendment does not permit such disparate treatment.

The Sixth Circuit's ruling in *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011),

illustrates the point.  In *Saieg*, the court struck down a content-neutral restriction on leafletting,

applying intermediate scrutiny and concluding as follows:

> Even though the leafleting restriction is content neutral and might provide ample
> alternative means of communication, the policy is not a reasonable time, place, and
> manner restriction.  Within the inner perimeter, *the restriction does not serve a
> substantial governmental interest, as evidenced by the defendants' willingness to
> permit sidewalk vendors and ordinary pedestrian traffic on the same sidewalks
> where they prohibited Saieg from leafleting.*

*Id*. at 740-41 (emphasis added); *see also City of Ladue v. Gilleo,* 512 U.S. 43, 52 (1994)

("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy

for a reason quite apart from the risks of viewpoint and content discrimination:  They may diminish

the credibility of the government's rationale for restricting speech in the first place.").

Additionally, any assertion that organized groups are less likely to social distance than

unorganized groups is speculative at best.  And, apparently, the current magic number that will

abide by social distancing protocols is ten people.  But, of course, just weeks ago the magic number

was one person.  And with the government-approved protests, there is no magic number.

Moreover, City officials are perfectly capable of requiring permits and to restrict pedestrian

access to any larger demonstration in exactly the same way they make room for parades and large

demonstrations at other times.  Defendants' small army of police officers is more than capable of

ensuring that *peaceful* protestors, such as Plaintiff, maintain social distancing protocols, including wearing masks as necessary.  In short, there is no support for Defendants' former restriction of one person, or its migration to ten people, when the very same location (*e.g.,* City Hall Plaza) might have hundreds of people lawfully social distancing as pedestrians or socializing neighbors or dog-walkers or government-approved protestors.  The First Amendment demands more.

And it is no defense to this constitutional challenge that Plaintiff might have alternative ways of communicating her message.  *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984) ("[L]aws regulating public fora cannot be held constitutional simply because they leave potential speakers alternative fora for communicating their views."); *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 607 ("[B]ecause we have already found that the Ordinance is not narrowly tailored, whether the City of Dearborn has provided ample alternatives of communication is now irrelevant in this case. . . ."); *see also Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) ("[A]lternative mode[s] of communication may be constitutionally inadequate if the speaker's 'ability to communicate effectively is threatened' [and a]n alternative is not ample if the speaker is not permitted to reach the 'intended audience.'").  By prohibiting public protests outside City Hall—the seat of local government and the targeted location of Plaintiff's protest message—the alternatives are constitutionally inadequate because Plaintiff's ability to effectively communicate her protest message opposing Defendant de Blasio's policies is threatened, and she is unable to reach her intended audience—Defendant de Blasio and those who advise him.

### III.    Plaintiff Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

The proof of irreparable harm suffered by Plaintiff is clear and convincing.  It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976);

*Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002) (same); *Newsom v. Norris*, 888 F.2d

371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal

infringement upon First Amendment values constitutes irreparable injury sufficient to justify

injunctive relief.") (citing *Elrod*); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen

reviewing a motion for preliminary injunction, if it is found that a constitutional right is being

threatened or impaired, a finding of irreparable injury is mandated."). As explained by the Second

Circuit:

> As for irreparable harm, the district court noted that if New York Magazine were
> correct as a matter of law that MTA's action unlawfully abridged its freedom of
> speech as guaranteed by the First Amendment, New York Magazine established
> irreparable harm. The "'loss of First Amendment freedoms, for even minimal
> periods of time, unquestionably constitutes irreparable injury.'" *Deeper Life
> Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir. 1988)
> (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the district court correctly
> found that the facts presented constitute a violation of New York Magazine's First
> Amendment freedoms, New York Magazine established *a fortiori* both irreparable
> injury and a substantial likelihood of success on the merits.

*N.Y. Magazine*, 136 F.3d at 127. This factor favors granting the requested injunction.

## IV.   The Balance of Equities Tips Sharply in Favor of Granting the Injunction.

The likelihood of harm to Plaintiff without the injunction is substantial because the

deprivation of First Amendment rights, even for minimal periods, constitutes irreparable injury.

(*See supra* § III). Additionally, Defendants' public health interest can be advanced by ensuring

social distancing during the public protests (interests which they have abandoned with the

government-approved protests), similar to how Defendants permit individuals to jog or cycle on

public streets while maintaining social distancing. In sum, the balance of equities favors the

granting of the requested injunction.

- 24 -

V.      **Granting the Injunction Is in the Public Interest.**

The impact of the injunction on the public interest turns in large part on whether Defendants violated Plaintiff's rights protected by the First Amendment.  *See Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 615 (S.D.N.Y. 2012) (entering a permanent injunction immediately following *AFDI v. MTA I* and noting that "the public as a whole has a significant interest in . . . protection of First Amendment liberties") (internal quotations and citation omitted); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties").

As noted previously, the challenged restrictions criminalize Plaintiff's core political speech in a traditional public forum, thereby punishing and thus depriving Plaintiff of her fundamental rights protected by the First Amendment.  It is in the public interest to issue the injunction.

## CONCLUSION

For the foregoing reasons, this Court should grant the motion and issue the requested injunction.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *David Yerushalmi*
David Yerushalmi, Esq.* (DC # 978179)
383 Kingston Avenue, Suite 103
Brooklyn, New York 11213
Tel: (646) 262-0500; Fax: (801) 760-3901

Robert Joseph Muise, Esq.* (MI P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901

*Subject to admission *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2020 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

### AMERICAN FREEDOM LAW CENTER

*/s/ David Yerushalmi*
David Yerushalmi, Esq.