UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: August 3, 2020

—————————————————————————

PAMELA GELLER,

                              Plaintiff,

            – against –

ANDREW CUOMO, *in his official capacity as Governor of the State of New York*, BILL DE BLASIO, *individual and in his official capacity as Mayor, City of New York, New York*, and DERMOT SHEA, *individually and in his official capacity as the Police Commissioner, City of New York, New York*,

                              Defendants.

—————————————————————————

**OPINION AND ORDER**

20 Civ. 4653 (ER)

Ramos, D.J.:

        Facing an unprecedented global pandemic and a dangerously surging number of COVID-19[1] cases, Andrew Cuomo, Governor of the State of New York, issued Executive Order No. 202.10 on March 23, 2020, that, in relevant part, banned all non-essential gatherings of individuals of any size for any reason.  That original Executive Order was subsequently amended on two occasions, so that as of the date of this order, non-essential gatherings of up to 50 people are permitted in all regions of New York State.  On June 17, 2020, Pamela Geller brought this action under the First and Fourteenth Amendments against the Governor, New York City Mayor Bill de Blasio, and New York Police Department Commissioner Dermot Shea (with Mayor de Blasio, the "City"), challenging the restrictions on non-essential gatherings as a violation of her

—————————————

[1] The Court may take judicial notice of "relevant matters of public record."  *See Giraldo v. Kessler*, 694 F.3d 161, 163 (2d Cir. 2012).  According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person.  *See* Doc. 27, Ex. B.  There is no pre-existing immunity against this new virus, which has spread worldwide in an exceptionally short period of time, posing a serious public health risk.  *Id*.  On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *Id*. Ex. D.

constitutional right to engage in public protest.  Now before the Court is Geller's motion for a preliminary injunction enjoining Defendants from enforcing the restrictions on non-essential gatherings so that she can organize a protest of between 25 to 100 people.  For the reasons set forth below, Geller's motion is DENIED.

## I.   Background

### A.   The COVID-19 Executive Orders

On March 1, 2020, New York State recorded its first case of COVID-19 in New York City.  On March 7, 2020, the Governor declared a State of Emergency.  At the time, 60 people had tested positive in New York.  By March 20, 2020, that number approached 10,000, with over 150 deaths.[2]  On March 20, the Governor announced the New York State on PAUSE initiative, which very generally speaking, closed all non-essential private businesses and governmental activities.  This initiative included, as relevant to this case, Executive Orders aimed at restricting non-essential outdoor gatherings.

On March 23, the Governor issued Executive Order No. 202.10 which, in relevant part, banned non-essential gatherings of individuals of any size for any reason.  That restriction remained in place until May 21.

On May 21, the Governor issued Executive Order No. 202.32, which modified Executive Order 202.10 to permit non-essential outdoor gatherings of ten or fewer individuals for any religious service or ceremony, or for the purposes of any Memorial Day service or commemoration.  The following day, on May 22, the Governor issued Executive Order No. 202.33, which extended the loosening of the gathering restrictions to any non-essential outdoor

---

[2] *See* Doc. 27, Ex. H (Image from Johns Hopkins University's Coronavirus Resource Center, available at https://coronavirus.jhu.edu/us-map, last visited June 1, 2020).

gathering of ten or fewer individuals for any reason, provided the participants follow appropriate

social distancing, cleaning and disinfection protocols.

On June 15, the Governor issued Executive Order No. 202.42, which extended Executive

Order No. 202.33 until July 15, and further modified it to permit non-essential outdoor

gatherings of up to 25 individuals for any reason, provided that the gathering was in a region that

had reached Phase Three of the New York State's reopening plan as described below, and the

participants follow appropriate social distancing protocols.

Also on June 15, the Governor issued Executive Order No. 202.45, which permits non-

essential gatherings of up to 50 individuals for any reason, provided the gathering was in a

region that had reached Phase Four of the re-opening plan, and the participants follow

appropriate social distancing protocols.

Since the outbreak of the pandemic, New York City has followed the State's lead in

imposing restrictions.  *See* Doc. 25.  On March 25, Mayor de Blasio issued an Executive Order

No. 103 that provided:

> In order to avoid the mass congregation of people in public places and to
> reduce the opportunity for the spread of COVID-19 any non-essential
> gathering of individuals of any size for any reason shall be cancelled or
> postponed.

On May 22, a New York City Police Department General Administration Information

memorandum that was issued to all police commanders (the "Enforcement Guidance"), in

relevant part, provided:

> As of Today, gatherings involving a maximum of 10 people are
> permissible so long participants maintain a distance of 6 feet from each
> other.  Examples of the types of 10-person gatherings that are now
> permissible are religious services, social gatherings, weddings and
> protests…If a [member of service] ("MOS") observes a gathering of more
> than 10 people, MOS should remind the participants that large gatherings
> are not permitted and order the group to disperse.  If the large gathering is

> egregious and poses a danger to public health, MOS should call for a
> supervisor to respond to the scene.  Enforcement should only be taken as a
> last resort if the group refuses to comply with an order to disperse from a
> large dangerous gathering.

*See* Doc. 28, Ex. E.  The City's Executive Order No. 129, issued on July 2, 2020, specifically

incorporates "all relevant provisions of Governor Executive Order No. 202 and subsequent

orders issued by the Governor."[3]  Doc. 25 ¶ 6.

    The regulations put in place by the City and State have proven to be largely successful.

Since April 9, 2020, the number of positive tests per day in New York has declined steadily.  On

June 29, for example, 46,428 people were tested and only 319 tested positive—a positivity rate

below 0.7 percent.  *See* Doc. 27, Ex. W.  Due to the success New York State has had in flattening

the curve,[4] the Governor transitioned from the New York State on PAUSE initiative to a re-

opening plan that established four "phases" to guide non-essential businesses and offices on how

to reopen, with Phase One having the most restrictions on the size of outdoor gatherings and

indoor occupancy rates, and Phase Four having the least.  *See* https//forward.ny.gov/ny-forward.

    **B.**    **The Prior Case**

    This is Geller's second lawsuit in this Court challenging the COVID-19 restrictions on

non-essential gatherings.  Geller, a self-described "Champion of the First Amendment," is the

president of a non-profit organization named American Freedom Defense Initiative, a published

author, a conservative blogger, and a political activist who has successfully organized several

political protests in New York City in the past.  Compl., Doc. 1, ¶ 10.  She has 1,289,034

---

[3] At the preliminary injunction hearing, the City represented that they intend on continuing to follow the State's COVID-19 restrictions.

[4] Public health efforts aimed at stopping the pandemic from overwhelming a state's healthcare system are referred to as "flattening the curve."

followers on Facebook,[5] over 200,000 followers on Twitter,[6] 108,000 followers on Instagram,[7] and 28,900 followers on YouTube.[8] [9]

On May 7, 2020, Geller filed her first lawsuit against the City, arguing that the City's Executive Order No. 103 banning all non-essential gatherings of any size for any reason violated her First Amendment right to freedom of speech.  *Geller v. de Blasio* ("*Geller I*"), ---F. Supp. 3d ---, 2020 WL 2520711 (S.D.N.Y. May 18, 2020).

Prior to May 4, 2020, Geller allegedly had planned for and begun to organize a public protest of the City's gathering restrictions.  Compl., Doc. 1 ¶ 56.  The protest was to include between 25 and 100 people standing silently on the public streets of New York City, including the public sidewalks around City Hall plaza, with face coverings, observing social distancing protocols, and holding signs conveying their protest message.  *Id.*  However, Geller purportedly canceled her planned protest after a press conference held on May 4 by City Officials ("the May 4 Press Conference") where Mayor de Blasio provided a status report on the impact of the pandemic on the City.  *Geller I*, 2020 WL 2520711 at *1.  After reporting that substantial challenges remained despite progress in combatting the virus, Mayor de Blasio explained that summonses would be issued to people in any substantial gathering.  *Id.*  In response to a reporter's question[10] as to whether the City had a "policy as to how to approach…protests with maintaining freedom of speech, but at the same time maintaining the social distancing,"

---

[5] *See* https://www.facebook.com/pamelageller.

[6] *See* https://bit.y/2YSC3QK.

[7] *See* https://www.youtube.com/user/atlasshrugs2000.

[8] *See* https://www.youtube.com/user/atlasshrugs2000.

[9] The Court takes judicial notice of these facts pursuant to Federal Rules of Evidence 201.  *See* Fed. R. Evid. 201; *see also Braun v. United Recovery Sys.*, 14 F. Supp. 3d 159, 164 (S.D.N.Y. 2014).

[10] The reporter prefaced his question by referencing a protest the day before where police officers threatened to issue summonses and make arrests if the protestors and the media did not disperse.  Compl., Doc. 1 ¶ 39.

Commissioner Shea explained that protests should not be "taking place in the middle of a pandemic by gathering outside and putting people at risk." *Id*.  Mayor de Blasio followed by stating that "people who want to make their voices heard, there's plenty of ways to do it without gathering in person" and that they should "use all the other tools [they] have to get [their] point across but avoid anything that might put other people in harm's way." *Id*.

On May 12, Geller filed a motion for a temporary restraining order in *Geller I*, which Judge Cote denied on the basis that Geller was not likely to succeed on the merits of her First Amendment claim. *Id*., at *2.  Recognizing the "special protection" accorded to "speech on matters of public concern," and that the Government's authority to regulate expressive conduct is usually "sharply circumscribed" in traditional public forums, Judge Cote nevertheless held that this protection is not absolute, noting:

> Over a century ago, the U.S. Supreme Court taught that a community has the right to protect itself against an epidemic of disease which threatens its members.  In such times, judicial scrutiny is reserved for a measure that has no real or substantial relation to the object of protecting the public health, the public morals, or the public safety, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law.  As explained by the Supreme Court, a court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case.  Given the COVID-19 pandemic, and the City's place as an epicenter of that pandemic in this country, it is necessary to review the restriction expressed in the March 25 Executive Order through that lens.

Id., at * 3.  Guided by those principles, Judge Cote found that intermediate scrutiny applied because the Executive Order at issue was content-neutral, and that the order was reasonably and narrowly tailored to advance the City's interest in curbing COVID-19.  *Id*., at *4.  Specifically, Judge Cote found:

> Given the severity of the public health crisis, the City has taken measures that are reasonable and narrowly tailored in temporarily prohibiting public

> gatherings.  While a measure restricting all public group activity may not
> likely be found narrowly in ordinary times, these times are extraordinary.
> The City has demonstrated that the scientific and medical communities
> believe that preventing in-person gatherings is crucial to any strategy of
> containment.  As the City has argued, the declining rates of infection and
> death among New Yorkers is evidence not that the gatherings ban is
> overly broad, but rather that it is effective.  As there is no evidence to
> suggest that the City has misunderstood the dangers of person-to-person
> spread of COVID-19, the Court declines to second guess the City's
> measure that clearly seeks to mitigate this risk.

*Id.*

After denying Geller's motion for a temporary restraining order, Judge Cote entered judgment for the City at the parties' request.  That same day, Geller filed a notice of appeal, and filed an emergency motion for an injunction pending appeal two days later.

On May 25, 2020, prior to Geller's appeal being heard by the Second Circuit Court of Appeals, George Floyd died while being physically restrained by three police officers in Minneapolis, Minnesota.  His horrific death at the hands of the police, which was recorded by several bystanders, sparked street protests around the country and indeed, the world.  Beginning on May 28, protests took place in the streets of New York City as well.  The protestors appeared to embrace the Black Lives Matter ("BLM") movement.[11]  Many of the protests included hundreds and even thousands of participants.  According to Geller, the Governor and Mayor de Blasio "embraced" and affirmatively encouraged the BLM protests in a joint press release posted online on June 1, to respond to the violence that some of the protestors engaged in.  Compl., Doc.1 ¶ 51.  Specifically, Geller cites the following statements by Mayor de Blasio:

---

[11] As described on its website, the BLM movement began in 2013 after the acquittal of George Zimmerman, who fatally shot Trayvon Martin in Florida, with the mission to "eradicate white supremacy" and to "intervene in violence inflicted on Black communities."  *See* https://blacklivesmatter.com/about/ (last accessed July 27, 2020). Nothing in the record suggests that the Black Lives Matter organization directed the demonstrations in New York City.

> I support and protect peaceful protest in this city.  The demonstrations we've seen have been generally peaceful.  We can't let violence undermine the message of this moment.  It is too important and the message must be heard.  Tonight, to protect against violence and property damage, the Governor and I have decided to implement a citywide curfew, the Police Commissioner and I have spoken at length about the incidents we've all seen in recent days where officers didn't uphold the values of this city or the NYPD.  We agree on the need for swift action.

*Id*.  Geller further cites the following statements by the Governor:

> I stand behind the protestors and their message, but unfortunately there are people who are looking to take advantage of and discredit this moment for their own personal gain, the violence and the looting that has gone on in New York City has been bad for the city, the state and this entire national movement, undermining [] and distracting from this righteous cause.  While we encourage people to protest peacefully and make their voices heard, safety of the general public is paramount and cannot be compromised.  At the same time, we are in the midst of a global pandemic which spreads through crowds and threatens public health.  Tonight the Mayor and [I] are implementing a citywide curfew starting at 11 PM and doubling the NYPD presence across the city.

*Id*.  During a press conference also on June 1, 2020, when asked if he would suggest people not

go out and protest, Governor Cuomo answered:

> No, I think you can protest, but do it smartly and intelligently…There were protests all across the country.  Protest.  Just be smart about it.  With this virus, you can do many things now as long as you're smart about it, right?  You can reopen, you can go into a store and you can do a lot of things, just be smart.[12]

*See Soos v. Cuomo*, No. 20 Civ. 651 (GLS/DJS), 2020 WL 3488742, at *4 (N.D.N.Y. June 26,

2020).  That same day, the following exchange took place when Governor Cuomo appeared on

MSNBC's Deadline: White House with Nicolle Wallace:

> Nicolle Wallace:  I spoke to our mutual friend Chris Christie over the weekend and he said that the economic despair that people are feeling in a lot of these cities is contributing to the hopelessness and the rage and the exasperation and the just despair with the state of all of it.  With our inability to protect our citizens from a deadly virus.  Our inability to

---

[12] At the time, non-essential outdoor gatherings of up to 10 people were permitted pursuant to Executive Order No. 202.33.

protect people's economic security, their life saving's [sic], in the case of small business owners.  And our inability to protect black Americans in particular from police.  What do you have to say to people who are feeling hopeless?

Governor Cuomo:  It's right.  It's right.  I said on day one, I stand with the protesters.  I believe this is a moment in history, Nicolle, where we can actually galvanize and make change.  There are forces coming together here, let's be honest.  It's not a coincidence that this is in the middle of the COVID crisis.  The poor paid the highest price for this Covid situation.  They were essential workers, their communities had a higher infection rate.  They're living in public housing.  You can't socially distance on an elevator in public housing.  They were living paycheck to paycheck and now they're destitute.  They paid the highest price.  They always pay the highest price.  It has just exploded the blatant injustice and racism in this nation.  I said today, my father did the Tale of Two Cities speech in 1984 at the Democratic convention.  It was true then, it's true now.  Let's make this a moment of progressive reform and focus on a real agenda going forward.

Nicolle Wallace:  The divisions are there, the divisions are being exploited by this President, by the White House, the divisions a lot of people feel are exploited in some corners of the media.  Most people don't want to feel divided.  What can people do?  What are you urging citizens of New York to do today, tonight?

Governor Cuomo:  Tonight, I'm saying be smart.  We talk about New York tough.  Part of being New York tough is being smart.  We have to be smart.  You want protest, don't lose in the protest.  Don't be exploited.  Don't make it a mask for criminal activity or for extremist organizations.  If you're going out, wear a mask.  Socially distance.  Don't put your life at risk.  That's short term.[13]

That same day, the Chief of Department of the New York City Police, Terence Monahan, was photographed as he kneeled with a BLM protester at Washington Square Park.  Compl. ¶ 52.  At a press conference two days later, Mayor de Blasio made the following statement:

Don't just see the part where he kneels down, see what he says.  And he's saying, pure passion from the heart, and he points to the officers around

---

[13] *See* "Governor Cuomo is a Guest on MSNBC's Deadline: White house with Nicolle Wallace," June 1, 2020, at https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-gest-msnbcs-deadline-white-house-nicolle-wallace (last visited July 31, 2020).

> us, and he says none of us believe what happened in Minnesota was right.
> And it was a very important moment, it was a watershed moment to me…

*Id.* ¶ 54.

At oral argument in the instant motion, Defendants' attorneys confirmed that no permits were requested or issued for those protests, nor were arrests made of any protestor simply for peaceably protesting.

Because no arrests were made of peaceful protestors, Geller argued, for the first time during oral argument before the Second Circuit, a selective enforcement Equal Protection claim. On June 4, the Second Circuit denied Geller's emergency motion without prejudice to renew "in the event that Appellant amends her complaint and/or seeks appropriate relief in the district court in light of facts and arguments articulated for the first time during oral argument."[14]  *Id.* ¶ 67.

Also on June 4, Governor Cuomo went on an interview on WAMC Northeast Public Radio and made the following statements:

> Here's the challenge of the time:  There are multiple truths and people only want to hear their own truth, but there are multiple truths.  Yes, protestors have a right to protest and they should be righteously indignant about the murder of Mr. Floyd.  They should be upset and I love to see those young people out there, African Americans, whites saying we're not going to take this anymore.  We want reform.  That's a truth.[15]

**C.     The Instant Case**

Geller filed the instant case on June 17, 2020.  Doc. 1.  On June 23, she moved for a preliminary injunction.  Doc. 16.  A preliminary injunction hearing was held telephonically before this Court on July 23.

---

[14] Geller then voluntarily dismissed her appeal, and filed the instant action.  *Id.* ¶ 68.

[15] *See* "Governor Cuomo Is a Guest on WAMC Northeast Public Radio with Alan Chartock," June 4, 2020, at https://www.governor.ny.gov/news/audio-rsuh-transcript-governor-cuomo-guest-wamc-northeast-public-radio-alan-chartock-4 (last visited July 31, 2020).

At the hearing, Geller's counsel acknowledged that she has not attempted to apply for a permit for her planned protest. Geller's counsel further acknowledged that the recent BLM protests were spontaneous, and that no permits were issued by either New York State or City, which the City confirmed. [16]

In response to a question by this Court as to whether an application from Geller would be futile, the Governor's counsel responded it is not clear on this record, but that in any event Geller would have had to first do something to trigger some sort of enforcement action before she could bring an as-applied First Amendment Challenge.   The City acknowledged that Mayor de Blasio has expressed his support for the BLM protests, and that they were not aware of any enforcement against peaceful protestors for violating the gathering restrictions since the demonstrations related to Floyd's death began.  In addition, the City explained that while law enforcement did not enforce the gathering restrictions at the protests, given the tense and emotional circumstances that inspired the protests, it was particularly important to give law enforcement the flexibility to make real time decisions as to whether to make an arrest or not, lest they exacerbate an already volatile situation.  The City further explained:

> Well, certainly when the protests began, it was in the context of there
> having been protests in other cities as well that had turned violent.  And
> that was something that the city, I believe, was very cognizant of.  And,
> you know, there was a very large group of people that spontaneously
> gathered to protest.  And that is a situation in which there have to be
> decisions made on the ground tactically about the best way to handle that.
> I mean, it is not always feasible or appropriate to start arresting people
> under those circumstances for violating a gathering ban…Well, for
> example, if it's a very large group, it can become violent against the police
> or against each other.  Unfortunately, we have seen that in other cities…It
> is a tactical decision that needs to be made by the police department and
> others responding on the ground as to what the statements and the best
> way to handle these gatherings are for the public at large as a community.

---

[16] According to Defendants, this is an important distinction for purposes of enforcement because enforcement against protests generally target the organizers.

At the conclusion of the preliminary injunction hearing, Geller requested that, if the Court were to deny her motion for preliminary injunction, it also deny her presumptive motion for injunctive relief pending appeal for substantially the same reasons because that motion would be exactly the same as the instant one, to which the Defendants had no objections.[17]

As of the date of this Order, all regions within New York State, including New York City, have reached Phase Four of the State's reopening plan.[18]  Pursuant to Executive Order No. 202.45, non-essential outdoor gatherings of up to 50 people are allowed.

While New York has been successful (to date) in flattening the curve, the pandemic is not over yet.  During the week of June 23, the United States reported the highest seven-day average of new COVID-19 cases.  During the week of July 23, New York City had reported 1,418 new positive cases of COVID-19, as well as 198 hospitalizations, and 58 confirmed deaths stemming from coronavirus.[19]  It is against this backdrop that the Court held the preliminary injunction hearing on July 23, 2020, and issues the instant opinion.

## II.   Legal Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)).  "A plaintiff seeking a

---

[17] The Second Circuit has held that under Fed. R. Civ. P. 62(c), which regulates the power of district courts to grant such relief, "a district court may grant injunctive relief after a proper notice of appeal has been filed, but only when it is necessary to preserve the status quo pending the appeal."  *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556 (2d Cir. 1991) (citing, *International Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines*, 847 F.2d 1988 (2d Cir. 1988)).

[18] *See* https://forward.ny.gov.

[19] *See* COVID-19: Data, New York City Health, available at https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last accessed August 3, 2020).  In comparison, during the week of April 9, New York City reported 34,344 positive cases of COVID-19, as well as 9730 hospitalizations, and 3,958 confirmed deaths.

preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Furthermore, the movant is held "to a heightened standard" where, as here:  (i) an injunction is "mandatory", *i.e.*, altering the status quo rather than maintaining it, or; (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *New York ex. Rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits.  *Id*. (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999), and *Doe v. N.Y.U.*, 666 F.2d 761, 773 (2d Cir. 1981)).

## III.    Discussion

### A.    Geller Has Not Shown A Clear Likelihood Of Success On The Merits

Although a showing of irreparable harm is often considered the "single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), "[c]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor."  *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

#### 1.    *Geller's First Amendment Facial Challenge Is Collaterally Estopped*

As mentioned above, Geller previously raised a First Amendment facial challenge to the City's implementation of the Governor's original ban on all non-essential outdoor gatherings of any size, Executive Order No. 202.10, and lost after briefing and a hearing.  Specifically, Judge Cote determined that the Executive Order was "reasonable and narrowly tailored."  *Geller I*,

2020 WL 2520711, at *4.  Judge Cote's well-reasoned opinion collaterally estops Geller from raising a similar First Amendment facial challenge in the instant action.

Collateral estoppel applies where "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Levich v. Liberty Central School Dist.*, 361 F. Supp. 2d 151, 157 (S.D.N.Y. 2004) (quoting *Colon v. Coughlin*, 58 F.3d 865, 869 n.2 (2d Cir. 1995)); *see also Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012) (issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.").

Here, Geller again argues that she has a likelihood of success on the merits on a First Amendment facial challenge to the Executive Order.  The only difference between her previous challenge and the instant one is that she is now challenging a *less* restrictive order.  But this is not a material distinction for purposes of applying collateral estoppel.  The issue necessarily decided in *Geller* I is the same issue presented in this case:  whether, applying intermediate scrutiny,[20] the government's interest in protecting the public against the pandemic outweighs Geller's First Amendment right to protest.  Because Judge Cote held that she was not likely to succeed on the merits of her facial challenge to the total ban, that ruling precludes re-litigation of another challenge towards a similarly facially neutral, but less restrictive Executive Order.

---

[20] In a forum traditionally open to the public, such as a public street or park, the government's authority to regulate speech or expressive conduct is typically "sharply circumscribed."  *Geller I*, 2020 WL 2520711, at *3 (quoting *Hobbs*, 397 F.3d at 148).  "A prior restraint on speech, *i.e.*, any regulation that gives public officials the power to deny use of a forum in advance of actual expression…bears a heavy presumption against its constitutional validity." *Id*. (citation omitted).  When such a regulation is content-neutral, as the Court finds below, intermediate scrutiny applies.  *Id*.)

Applying collateral estoppel here serves the underlying principles of the doctrine, which are to "save[] parties and the courts from the waste and burden or relitigating stale issues, and, by discouraging inconsistent result, forwards public policy favoring the establishment of certainty in legal relations." *Ferring B.V. v. Serenity Pharm., LLC*, 391 F. Supp. 3d 265 (S.D.N.Y. 2019) (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993)).

Moreover, even if the Court were to analyze her claim on the merits, it would still find that she has not established a clear likelihood of success.  Contrary to Geller's assertion, the change in facts, namely Defendants' subsequent public statements expressing approval of peaceful protests and their purported lack of enforcement of the gathering restrictions with respect to the BLM protests, do not warrant a different outcome.

In order to determine the appropriate level of scrutiny, it is necessary to note the differences between a facial and an as-applied First Amendment challenge.  On a facial challenge, a court "considers only the text of the [provision] itself, not its application to the particular circumstances of an individual."[21]  *See Field Day, LLC v. Cnty. Of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n.11 (1988)).  The Second Circuit further clarified the point by instructing that when reading a regulation in the context of a facial First Amendment challenge, a court may do so in light of any "binding judicial or administrative construction" thereof, and must consider "the well-established practice of the authority enforcing the ordinance."  *Id*. (citing *City of Lakewood*, 486 U.S. at 770 n.11 ("[W]hen a state law has been authoritatively construed so as to render it constitutional, or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, they are read in light of those limits.")).  On its face, Executive Order No.

---

[21] On an as-applied challenge, on the other hand, the Court is required to examine the "facts of a particular case to decide if a facially constitutional statute "deprived the individual to whom it was applied of a protected right."  *Id*. at 174–75.

202.45 is content-neutral because it expressly applies to all non-essential gatherings without regard to the messages conveyed by those gatherings. *See also Geller I*, 2020 WL 2520711, at *3.

Geller's argument that the Executive Order should be read as a content-based regulation because of the City's "practice and policy" selectively suspending the First Amendment for some protests while "encouraging" the BLM protests, is unpersuasive. To begin, Geller's characterization of Defendants' public statements as evidence of viewpoint discrimination is overstated. Mr. Floyd's death sparked an immediate, spontaneous outpouring of righteous anger than reverberated around the globe. Tens of thousands engaged in street demonstrations in New York City on a near daily basis. Indeed, regular protests continue to this day, more than two months later. Certain of those demonstrations turned violent, with protestors destroying property and looting businesses. It is against that backdrop that Defendants made the public statements that Geller relies on so heavily. As is clear from the June 1 Press Release, the statements were made in response to the violence that marred certain demonstrations. (De Blasio: "I support and protect peaceful protests in this city. The demonstrations we've seen have been generally peaceful. We can't let violence undermine the message of the moment…Tonight, to protect against violence and property damage, the Governor and I have decided to implement a citywide curfew[.]"; Cuomo: "I stand behind the protestors and their message, but unfortunately there are people who are looking to take advantage of and discredit this moment for their own personal gain, the violence and the looting that has gone on in New York City, the state and this entire national movement, undermining [] and distracting from this righteous cause."). It was because of that violence that a curfew was imposed. In light of that context, Defendants' statements may

reasonably be construed as acquiescing to the inevitability of the protests, rather than actively "encouraging" protests.[22]

Furthermore, as the City suggested at oral argument, reasonably in the Court's view, public officials need to have the flexibility to determine how to enforce the gathering restrictions, to determine the circumstance under which arrest may or may not be appropriate.  The Enforcement Guidance provided to each member of the New York City Police Department further supports this view.  The Guidance, issued prior to Mr. Floyd's death, directs police officers in the first instance to instruct participants in gatherings to disperse and that "[e]nforcement should only be taken as a last resort if the group refuses to comply with an order to disperse from a large dangerous gathering."  It is not difficult to imagine that if robust efforts were made to enforce the gathering restrictions in response to the Floyd demonstrations, an already fraught and combustible situation would have been made worse.  As the City noted at oral argument:

> There was a very large group of people that spontaneously gathered to protest.  And that is a situation in which there have to be decisions made on the ground tactically about the best way to handle that.  I mean, it is not always feasible or appropriate to start arresting people under those circumstances for violating a gathering ban…Well, for example, if it's a very large group, it can become violent against the police or against each other…It is a tactical decision that needs to be made by the police department and others responding on the ground as to…the best way to handle these gatherings are for the public at large as a community.

Under these circumstances, the Chief Justice's words in *South Bay Pentecostal Church v. Newsom*, seem particularly fitting:  public officials responding to a public health crisis must be afforded especially broad latitude, such that they should not be open to "second-guessing" by an "unelected federal judiciary which lacks the background, competence, and expertise to assess

---

[22] At the same time, the Governor stressed the importance of remaining vigilant against the virus:  "I think you can protest, but do it smartly and intelligently…With this virus, you can do many things now as long as you're smart about it [.]"

public health and is not accountable to the people."  140 S.Ct. 1613, 1613–14 (2020) (Roberts, C.J. concurring).  The Court therefore declines Geller's invitation to "play an active and probing role in testing any underlying factual assertions serving as Defendants' basis" for imposing the gathering restrictions, in the context of her facial First Amendment challenge.  *See* Mem. of Law in Supp. re Mot. for Prelim. Inj., Doc. 18, at 21.  To that end, the Court agrees with Judge Cote's reasoning in *Geller I* that any constitutional analysis must be undertaken through the lens of *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) (upholding a vaccination statute enacted by Massachusetts to protect against smallpox), in light of the ongoing pandemic. *Geller I*, 2020 WL 2520711, at *3.

In *Jacobson*, the Supreme Court declared that "a community has the right to protect itself against an epidemic of disease which threatens its members," and that in such times judicial review is reserved for a measure that "has no real or substantial relation" to the object of public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  197 U.S. at 31.  More recently, courts across the country have relied on *Jacobson* in refusing to enjoin state and local restrictions aimed at protecting the public against the spread of COVID-19.[23]  *See Geller I*, 2020 WL 2520711; *see also Ass'n of Jewish Camp Operators v. Cuomo*, ---F.Supp.3d---, 2020 WL 3766496, at *8 (N.D.N.Y. July 6, 2020) ("the Court joins the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID-19 pandemic" and conducting traditional First Amendment analysis only in the alternative); *Six v. Newsom*, ---F.Supp.3d---, 2020 WL 2896543, at *3 (C.D. Cal. May 22, 2020) (discussing *Jacobson* as "the well-established test that governs when courts are asked to analyze the

---

[23] *See* Mem. of Law in Opp'n.re Mot. for Prelim. Inj., Doc. 26, at 18 n.7 (collecting cases where courts have rejected challenges to state and local government restrictions enacted over the past few months).

constitutionality of state powers to protect the public health").  They have uniformly found that

the restrictions were adopted for the undeniable public interest in fighting COVID-19 which, as

discussed below, has only become more apparent since the cases were decided.[24]  In contrast,

Geller's conclusory assertions that Defendants adopted these gathering restrictions to "silence

opposition to" these very restrictions, are unsupported by the record.

Accordingly, because the Executive Order prohibits non-essential outdoor gatherings of

over 50 people regardless of the messages expressed, the Court has no difficulty in concluding,

as Judge Cote did, that the restriction was enacted to protect the public health and bears a real

and substantial relation to the public safety concerns at issue.  *See Jacobson*, 197 U.S. at 31.  The

Court further concludes that it is narrowly tailored because it promotes a substantial government

interest that Geller does not dispute, namely, to mitigate the harm and spread of the pandemic,

which would be "achieved less effectively" absent the gathering restrictions.  *Hobbs*, 397 F.3d at

149 ("The narrow tailoring requirement is satisfied so long as the regulation promotes a

substantial government interest that would be achieved less effectively absent the regulation,"

and the regulation "need not be the least restrictive or least intrusive means of doing so."); *see*

*also McCarthy v. Cuomo*, No. 20 Civ. 2124 (ARR), 2020 WL 3286530, at *4 (E.D.N.Y. June 18,

2020) ("I agree with Judge Cote's analysis that prohibitions on large public gatherings and other

similar restrictions are narrowly tailored to the interest of protecting the public from COVID-

19.").  Those conclusions have only been bolstered in recent weeks as conditions continue to

improve in New York State while other states that imposed less restrictive measures have seen

---

[24] Geller's citation to the recent decision in *Soos v. Cuomo*, No. 20 Civ. 651, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), granting a preliminary injunction enjoining the enforcement of New York's gathering bans solely as to the plaintiffs in that case based on a Free Exercise Clause challenge, misses the mark.  Here, Geller does not raise a Free Exercise Clause claim and the Court in *Soos* expressly declined to address the plaintiffs' First Amendment and Equal Protection claims.  *See Soos*, 2020 WL 3488742, at *4 n.4 ("Because each of the prongs is met with respect to plaintiffs' Free Exercise Clause claim, the court need not, and does not, analyze the remainders.").

an alarming surge in infection rates and deaths, showing that any progress attained may be fragile.  *See* Doc. 27, ¶¶ 43–47; *see also Geller I*, 2020 WL 2520711, at *4 (noting that "the declining rates of infection and death among New Yorkers is evidence not that the gatherings ban is overly broad, but rather that it is effective.").

Moreover, because there are "ample alternative channels for the communication of [Geller's] information," her contention that the COVID-19 Executive Order leaves her with no reasonable or effective alternatives to express her views is unpersuasive.  *See id.* (noting Geller is "free to express her discontent online, through media, and by protesting in public on her own."). In the first place, she could organize a protest of up to 50 participants today if she were so inclined.  Moreover, as the Governor correctly points out, Geller's substantial online presence and following undercuts her contention that a protest of between 25 to 100 people is the most effective way for her to express her point of view.

### 2.    *Geller Lacks Standing To Bring An As-Applied First Amendment Challenge*

The parties dispute whether Geller is precluded from bringing her as-applied First Amendment challenge before she has been charged with any violation of the gathering restrictions.

In support of their contention, Defendants cite *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of New York*, a case where a law firm challenged the constitutionality of the restriction on investments in law firms by non-lawyers under the New York Code of Professional Conduct and certain New York statutes.  852 F.3d 178, 182 (2d Cir. 2017).  The district court below dismissed the case for failure to state a claim, and the law firm appealed, contending that the New York provisions violated its First Amendment right to petition and to association.  *Id.* at 184.  The

Second Circuit held that "'[b]ecause plaintiffs pursue this pre-enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied challenge.'" *Id.* (quoting *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted)).

In response, Geller contends, relying principally on the Supreme Court's decision in *Steffel v. Thompson*, 415 U.S. 452, 459–62 (1974), that she need not subject herself to arrest to advance an as-applied challenge.  In *Steffel*, police officers twice threatened to arrest the plaintiff and his partner for distributing handbills on an exterior sidewalk of a shopping center in protest of American involvement in the Vietnam War.  *Id.* at 455.  The plaintiff left to avoid arrest, but his partner continued distributing handbills and was subsequently arrested and charged with violating a Georgia criminal trespass statute.  *Id.* at 455–56.  Notably, the parties stipulated in *Steffel* that if the plaintiff "returned and refused upon request to stop handbilling, a warrant would be sworn out and he might be arrested and charged with a violation of the Georgia statute."  *Id.*  The Supreme Court held that under those circumstances, "it is not necessary that [he] subject himself to actual arrest or prosecution" to seek a declaratory judgment that the trespass statute was unconstitutional as applied to him.

Geller also cites to the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).  In *Holder*, the Court considered an as-applied First Amendment challenge to a law that criminalized "'knowingly provid[ing] material support or resources to a foreign terrorist organization.'"  *Id.* at 8.  The plaintiffs there claimed that they had provided support to groups designated as terrorist organizations prior to the law's enactment and intended to continue to provide similar support in the future.  Moreover, the record showed that the Government had already charged 150 persons with violating the challenged law, and it expressly declined to

disclaim prosecution if the plaintiffs recommenced their support of those organizations.  The Supreme Court held that the plaintiffs faced a "credible threat of prosecution" and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"  *Id.*, at 15 (internal quotation marks omitted).

Although there appears to be some tension between *Jacoby* and *Steffel* and *Holder*, all of which are binding on this Court, the Court need not resolve that tension here because the facts of both *Steffel* and *Holder* are readily distinguishable from the instant case, and neither supports Geller's standing to bring an as-applied challenge.  Geller acknowledges that she never even attempted to apply for a permit for her planned protest.  Instead, she abandoned them before any interaction with the police, so that no threats of enforcement of the gathering restrictions have ever been made against her.

Geller cites to four arrests, as alleged in the complaints filed in two actions similarly challenging Defendants' gathering restrictions, *see Bouferguen v. Cuomo et al.*("*Bouferguen*"), No. 20 Civ. 3975 (S.D.N.Y. May 22, 2020); *see also Butler et al. v. City of N.Y. et al.*("*Butler*"), No. 20 Civ. 4067 (S.D.N.Y. May 27, 2020), as evidence that she will be subject to arrest if she proceeds with her planned protest.  Reply Mem. of Law in Supp. Re Mot. For Prelim. Inj., Doc. 28 at 4 n.4. ("citing prior arrests of protestors…making clear that Plaintiff's proposed protest…subject[] her to arrest").  As an initial matter, the Court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings.  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Even were the Court to accept the contents of those complaints as true, they do not establish a genuine threat of enforcement against Geller.  All four arrests were made on May 8

and 9 respectively, before the Floyd-related demonstrations began.  Out of the four arrests, three were made only after the arrestees failed to disperse despite being told to do so.[25] *See Bouferguen*, No. 20 Civ. 3975, Compl., Doc. 1 ¶¶ 18–29; *see also Butler*, No. 20 Civ. 4067, Compl., Doc. 1 ¶¶ 59–66.  Furthermore, the plaintiff in the *Bouferguen* action participated in a protest on May 2, 2020 against, *inter alia*, the gathering restrictions, with hundreds of protestors marching from the New York State Capitol and no arrest was made.  *See Bouferguen*, No. 20 Civ. 3975, Compl., Doc. 1 ¶¶ 16–17.  Another protest of 50 people was organized in Foley Square, New York City to protest the NYPD's enforcement of the COVID-19 Executive Orders. *See id.* ¶ 12.  According to the *Bouferguen* plaintiff, there were also no arrests despite presence of a "significant number of police officers."  *Id*.  In his opposition brief, the Governor points to four more news accounts of protests against New York's COVID-19, that took place from mid-April to mid-May, where no arrests were reported.  *See* Mem. of Law in Opp'n.re Mot. for Prelim. Inj., Doc. 26, at 24.  To the extent that there were any doubts before, the City has represented that no enforcement or prosecution has been made of individuals solely for protesting peacefully as violations of the gathering restrictions since the Floyd-related demonstrations began, and that to the extent any arrests were made, they were for actions in addition to simply protesting, such as destruction of property.  The Enforcement Guidance memorandum's clear instruction that enforcement should only be used as a last resort further undercuts any threat of enforcement or prosecution against Geller, especially in light of her representation that her planned protest would be peaceful and in compliance with social distancing protocols.  *See Steffel*, 415 U.S. at 475; *see also Holder*, 561 U.S. at 15.

---

[25] As alleged in *Butler*, even the fourth arrest was made five minutes after an order of dispersal was given.  But according to the arrestee, he was dispersing when he was arrested.  *See Butler*, No. 20 Civ. 4067, Compl., Doc. 1 ¶¶ 59–70.  New York Penal Code Law § 240.20 provides, in relevant part, that "a person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."

In any event, even were the Court to consider her as-applied challenge, it finds that Geller has not shown a clear likelihood of success on the merits thereof.  As noted above, on her as-applied challenge, the Court looks into Geller's particular circumstances.  *Field Day, LLC*, 463 F.3d at 185. (internal citations omitted).  To be sure, Geller's planned protest involves political speech, which is at the core of the First Amendment protection and deserving of special protection.  However, even political speech may be subject to reasonable time, place, and manner regulations that are content-neutral, serve a significant government interest, and that leave open ample alternative channels for communication of the information.  *See Geller I*, 2020 WL 2520711.; *see also Frumer v. Cheltenham Township*, 545 F.Supp. 1292, 1293–94 (E.D. Penn. 1982) (quoting *American Future Systems, Inc. v. The Pennsylvania State Univ.*, 688 F.2d 907, 915 (3d Cir. 1982) ("even speech entitled to the highest First Amendment protection may be subject to reasonable time, place, and manner regulations that are content-neutral, serve a significant government interest, and that leave open ample alternative channels for communication of the information.")).  Peaceful protests of up to fifty people are clearly permitted now.  Moreover, as discussed above, Geller's individual circumstances, namely her substantial online presence and following, mitigate any burden imposed on her by the 50-person cap, as she can continue to speak out to her more than one million followers through her social media platform, articles, and regular television appearances.[26]

---

[26] Geller has in fact regularly used these channels to protest New York's policies, including a post about this lawsuit, *see* https://www.facebook.com/pamelageller/posts/10159555602397439, another post about the requirement of wearing masks, *see* https://www.facebook.com/pamelageller/posts/10159470575842439, and one objecting to the Executive Orders as an attempt to seize complete dictatorial control, *see* https://www.facebook.com/pamelageller/posts/10159398494187439.  According to her website, she has also published multiple books, written op-eds in publications all over the world, and regularly appears on television.  *See* https://gellerreport.com/about/.

### 3. *Geller Has Failed To State A Selective Enforcement Equal Protection Claim*

To the extent Geller bases her as-applied challenge on a claim that the gathering restrictions are applied to her in a discriminatory fashion against her First Amendment protected views, that challenge "coalesce[s]" with her selective enforcement Equal Protection claim, s*ee Cobb v. Pozzi*, 363 F.3d 110 (2d Cir. 2004), and she has not shown a clear or substantial likelihood of success on the merits thereof.

In order to state a selective enforcement Equal Protection claim, a plaintiff must plausibly allege:  (1) that she, compared with others similarly situated, was "selectively treated"; and (2) that such "selective treatment" was based on "impermissible considerations" including, among other things, "intent to inhibit or punish the exercise of constitutional rights." *Bar-Levey v. Gerow*, No. 18 Civ. 9454 (NSR), 2020 WL 814925, at *5 (S.D.N.Y. Feb. 19, 2020) (citing *Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017)).  To satisfy the first prong, a plaintiff must identify a "similarly situated comparator," and show that she was treated differently compared with that comparator. *See id*.  Geller has not done so here.  As she acknowledged at the preliminary injunction hearing, the BLM protests were spontaneous rather than organized, as her planned protest would be.  Additionally, there has been no interaction between Geller and any government officials or the police.  Finally, contrary to Geller's assertion and as discussed above, nothing in Defendants' public statements remotely suggest an attempt to suppress viewpoints against gathering restrictions, or that Defendants permit only protests expressing messages that they favor.

Accordingly, because Geller has not shown a clear or substantial likelihood of success on the merits of either her First Amendment or Equal Protection claims, the Court need not consider the other factors.  *See Geller I*, 2020 WL 2520711, at *5 (citing *Hsu v. Roslyn Union Free*

25

*School Dist. No 3*, 85 F.3d 839, 853 (2d Cir. 1996) (noting that in the First Amendment context a finding of irreparable harm is contingent on a plaintiff's likelihood of success on the merits)).

**IV.     Conclusion**

Because Geller has failed to show a clear or substantial likelihood of success, her motion for a preliminary injunction is DENIED.  As requested by Geller at the preliminary injunction hearing, her motion for injunctive relief pending appeal is also DENIED.  The Clerk of Court is respectfully directed to terminate motion, Doc. 16.

It is SO ORDERED.

Dated:  August 3, 2020
        New York, New York

_____
        Edgardo Ramos, U.S.D.J.