UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PAMELA GELLER,

      Plaintiff,

  – against –

KATHY HOCHUL, *in her official capacity as Governor of the State of New York*, BILL de BLASIO, *individually and in his official capacity as Mayor, City of New York, New York*, and DERMOT SHEA, *individually and in his official capacity as the Police Commissioner, City of New York, New York*,

      Defendants.

---

**OPINION AND ORDER**

20 Civ. 4653 (ER)

Ramos, D.J.:

  In Spring 2020, as New York City quickly became the global epicenter of the COVID-19 pandemic, then-Governor Andrew Cuomo and Mayor Bill de Blasio issued a series of executive orders prohibiting "non-essential gatherings."[1]  Pamela Geller has brought this action under the First and Fourteenth Amendments against the Governor, de Blasio, and New York City Police Department Commissioner Dermot Shea (with Mayor de Blasio, the "City"), challenging the executive orders in place as of June 17, 2020, the date this case was filed.[2]  Before the Court are the Governor's and the City's (collectively, "Defendants") motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons discussed, Defendants' motions are GRANTED.

---

[1] The Court substitutes Governor Kathy Hochul for former Governor Andrew Cuomo pursuant to Fed. R. Civ. P. 25(d).

[2] At the time this case was filed, the executive orders in place and applicable to Geller were Mayor de Blasio's E.O. 115, and the Governor's E.O. 202.41.

I.      **Background**

   A.      **The COVID-19 Gathering Restrictions**

      i.      **The Governor's Executive Orders**

Well over a year after the first COVID-19 case was recorded in New York, the breadth

and severity of the COVID-19 pandemic has been well-documented.[3]  This case, however, arises

from actions taken by City and State officials in the early months of the pandemic.

On March 1, 2020, the first case of COVID-19 was recorded in New York City.[4]  On

March 7, 2020, the Governor declared a State of Emergency following the report of seventy-six

confirmed cases statewide.[5]  By March 20, 2020, over 7,000 confirmed infections had been

reported statewide, and the Governor announced the New York State on PAUSE initiative,

which included the first of a series of Executive Orders ("E.O.s") restricting non-essential

gatherings, as well as closing all non-essential private businesses and governmental activities.[6]

On March 23, 2020, the Governor issued E.O. 202.10, which provided that "[n]on-

essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other

---

[3] COVID-19 is a highly infectious and potentially deadly respiratory disease.  *See* Basics of COVID-19, CDC (updated May 24, 2021), https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html (last visited September 23, 2021).  As of the date of this Opinion, there have been approximately 54,641 documented COVID-19 related deaths in New York state and 684,488 in the United States, and millions more infected.  *See* Coronavirus in the U.S.: Latest Map and Case Count, The New York Times (updated Sept. 24, 2021), https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited Sept. 24, 2021).  The Court takes judicial notice of these facts, as well as facts relating to the spread of COVID-19 in the days and weeks leading up to the executive orders at issue, as "relevant matters of public record."  *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); Fed. R. Civ. P. 201(b).

[4] *See* Dawn Kopecki, New York City Confirms First Coronavirus Case, CNBC (updated Mar. 2, 2020, 3:48 PM), https://www.cnbc.com/2020/03/01/first-coronavirus-case-confirmed-in-new-york-city.html (last visited September 23, 2021).

[5] *See* At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, New York State (Mar. 7, 2020), https://www.governor.ny.gov/news/novel-coronavirus-briefing-governor-cuomo-declares-state-emergency-contain-spread-virus (last visited Sept. 23, 2021).

[6] *See* Governor Cuomo Signs the 'New York State on PAUSE' Executive Order, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order (last visited Sept. 23, 2021).

social events) are canceled or postponed at this time." ¶ 21.[7]  The terms of this order were to

remain in place for thirty days unless terminated or modified at a later date.  ¶ 20.  Following

several short-term extensions of E.O. 202.10, the Governor issued E.O. 202.32 on May 21, 2020,

which modified E.O. 202.10 to permit non-essential outdoor gatherings of ten or fewer

individuals for any "religious service or ceremony, or for the purposes of any Memorial Day

service or commemoration." ¶ 25.  The following day, the Governor issued E.O. 202.33, which

extended the loosening of these restrictions to any non-essential outdoor gathering of ten or

fewer individuals for any lawful reason.  ¶ 26.  On June 13, 2020, the Governor extended these

restrictions to July 13, 2020, through E.O. 202.41.

On June 15, 2020 the Governor issued E.O. 202.42.  This order extended E.O. 202.41 to

July 15, and further modified it to permit non-essential outdoor gatherings of up to twenty-five

individuals for any region that had reached Phase Three of New York State's phased reopening

plan.  ¶ 29.  However, Geller alleges that, because New York City was in Phase One of the

State's reopening plan at the time she filed her Complaint, the 10-person gathering restriction set

forth in E.O. 202.41 still applied to her.  ¶ 30.

### ii.    The Mayor's Executive Orders

Mayor de Blasio also issued several executive orders consistent with the Governor's

E.O.s during this time.  On March 25, 2021, he issued Executive Order 103, which provided in

relevant part that "any non-essential gathering of individuals of any size for any reason shall be

cancelled or postponed." ¶ 34.

---

[7] Citations to "¶ _" refer to the Complaint, Doc. 1.

This order was subsequently extended on several occasions.  On May 24, 2020, the Mayor issued E.O. 115, which incorporated the ten-person gathering restriction set forth in the Governor's E.O. 202.33, discussed above.  ¶ 41.[8]

The upshot is that, at the time the Complaint was filed, public gatherings in New York City were restricted to ten people based on both the City and State E.O.s in place.   However, at the time the motions to dismiss were filed on January 26, 2021, New York City had reached Phase 4 of the State's reopening plan and permissible public gatherings were expanded to fifty people.  *See* Governor Cuomo Announces New York City Cleared by Global Health Experts to Enter Phase Four of Reopening Monday, July 20th, New York State (July 17, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-cleared-global-health-experts-enter-phase-four-reopening (last visited Sept. 23, 2021); *see also* Doc. 49 at 3. The Court also takes judicial notice of the fact that, as of June 15, 2021, the Governor had lifted all remaining restrictions on public gatherings following a series of incremental changes.  *See* Governor Cuomo Announces COVID-19 Restrictions Lifted as 70% of Adult New Yorkers Have Received First Dose of COVID-19 Vaccine, New York State (June 15, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-restrictions-lifted-70-adult-new-yorkers-have-received-first (last visited Sept. 23, 2021).  Thus, no further gathering restrictions are presently in effect.

Geller alleges that, at a press conference on May 4, 2020, the Mayor "publicly and officially announced that the 'shut down' imposed by the executive orders included the suspension of the right to publicly protest in the City."  ¶ 38.  Geller alleges that this is when she

---

[8] While Geller's brief states that E.O. 115 was issued on May 29, 2020, the Court takes judicial notice of the fact that this order is dated May 24, 2020.  *See* Emergency Executive Order No. 115 (2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-115.pdf.

learned that public protests were considered "non-essential" activity under the applicable

executive orders.  Defendants have not contested that the E.O.s apply to public protest activity.

B.     **Geller's Desire to Hold a Demonstration**

Geller is a self-described "champion of the First Amendment."  ¶ 10.  She is president of

the American Freedom Defense Initiative, a nonprofit organization, and is a published author and

conservative blogger and activist.  *Id.*  She alleges that, prior to the May 4, 2020 press

conference, she had "planned for and begun to organize participation" in a public protest of the

various executive orders discussed above.  ¶ 56.  The protest was to include "between 25 and 100

people standing silently with face coverings, observing social distancing protocols, and holding

signs conveying their protest message."  *Id.*  She further alleges that, when she learned of

Defendants' position that protests of this sort were considered "non-essential" activity, she

cancelled her planned protest activity.   ¶ 57.  She alleges that her protests would have taken place

"on the City streets" and "the public sidewalks surrounding City Hall plaza."  ¶ 59.

C.     **Contemporaneous Protests Regarding Police Practices**

On May 25, 2020, George Floyd, an unarmed Black man, died in police custody in

Minneapolis, Minnesota after a police officer knelt on his neck, sparking protests against police

brutality across New York City and the rest of the country.  ¶ 49.  Geller alleges that Defendants

have "embraced the content and viewpoint" of the message of these protestors, whom the parties

largely refer to as the "Black Lives Matter" or "BLM" protestors.[9]  ¶ 50.  In support, she cites

several press releases and other public statements by Defendants.

---

[9] As the Court noted in its decision on Geller's preliminary injunction motion, the BLM movement began in 2013
with the mission to "eradicate white supremacy" and to "intervene in violence inflicted on Black communities."  *See
Geller v. Cuomo*, 476 F. Supp. 3d 1, 8 n.11 (S.D.N.Y. 2020) ("*Geller II*") (citing Black Lives Matter,
https://blacklivesmatter.com/about/).  While the Court in *Geller II* acknowledged that "nothing in the record
suggests that the Black Lives Matter organization directed the demonstrations in New York City," 476 F. Supp. 3d
at 8 n.11, the parties have referred to the summer 2020 anti-police brutality protests as the "BLM" protests, and the

For example, she quotes a press release in which de Blasio stated the following:

"I support and protect peaceful protest in this city.  The demonstrations we've seen have been generally peaceful.  We can't let violence undermine the message of this moment.  It is too important and the message must be heard.  Tonight, to protect against violence and property damage, the Governor and I have decided to implement a citywide curfew," said Mayor Bill de Blasio.  "The Police Commissioner and I have spoken at length about the incidents we've all seen in recent days where officers didn't uphold the values of this city or the NYPD.  We agree on the need for swift action.  He will speak later today on how officers will be held accountable."

¶ 51 (emphases omitted).

She also cites to the following statement by then-Governor Cuomo.

"I stand behind the protestors and their message, but unfortunately there are people who are looking to take advantage of and discredit this moment for their own personal gain," said Governor Cuomo.  "The violence and the looting that has gone on in New York City has been bad for the city, the state and this entire national movement, undermining [ ] and distracting from this righteous cause.  While we encourage people to protest peacefully and make their voices heard, safety of the general public is paramount and cannot be compromised.  At the same time, we are in the midst of a global pandemic which spreads through crowds and threatens public health.  Tonight the Mayor and [I] are implementing a citywide curfew starting at 11 PM and doubling the NYPD presence across the city."

*Id.* (emphases omitted).

Geller also cites to several reported instances of New York City police officers either kneeling or joining hands with the BLM protestors, including then-New York City Police Chief Terence Monahan, and comments by de Blasio acknowledging this conduct.  ¶¶ 52–54.  At a press conference, de Blasio made the following statement:

> Don't just see the part where [Monahan] kneels down, see what he says.  And he's saying, pure passion from the heart, and he points to the officers around us, and he says none of us believe what happened in Minnesota was right.  And it was a very important moment, it was a watershed moment to me…

¶ 54 (emphases omitted).

---

Court accordingly will do so here for simplicity, consistent with its other opinions on the topic.  *See generally Geller II*; *Butler v. City of New York*, No. 20 Civ. 4067 (ER), 2021 WL 4084501 (S.D.N.Y. Sept. 8, 2021).

Geller cites to these statements and incidents as evidence of a policy of selective enforcement of the Executive Orders against her, and argues that they support her as-applied First Amendment challenge.

**D.   Geller's Prior Case**

On May 7, 2020, Geller filed her first lawsuit against the City regarding its COVID-19 gathering restrictions, arguing that the City's Executive Order 103 violated her First Amendment right to freedom of speech. *See Geller v. de Blasio*, No. 20 Civ. 3566 (DLC), ---F. Supp. 3d ---, 2020 WL 2520711 (S.D.N.Y. May 18, 2020) ("*Geller I*"). E.O. 103 prohibited non-essential gatherings of any size. As in this case, Geller sought preliminary and permanent injunctive relief and nominal damages. ¶ 60.

On May 18, 2020 the Honorable Denise Cote denied Geller's request for a temporary restraining order and, pursuant to an agreement by the parties, issued final judgment in favor of defendants de Blasio and Shea. ¶ 62. Geller appealed later that day, and requested an injunction pending the appeal on May 20, 2020. ¶¶ 62–63. Two days later, the Governor modified the gathering restrictions to permit group activity of up to ten people, and Mayor de Blasio followed suit by issuing E.O. 115 on May 24, 2020. ¶ 64. The Second Circuit denied Geller's motion on June 4, 2020. ¶ 67. The parties then stipulated to dismiss the appeal so that Geller could file the instant lawsuit alleging the new facts about the police brutality protests referenced above. ¶ 68.

**E.   The Instant Case**

Geller then filed the instant case on June 17, 2020. Doc. 1. On June 23, 2020 she moved for a preliminary injunction. Doc. 16. A hearing on the motion was held telephonically before this Court on July 23, 2020. The Court denied the motion on August 3, 2020. *See Geller v. Cuomo*, 476 F. Supp. 3d 1 (S.D.N.Y. 2020) ("*Geller II*").

Geller appealed from the Court's decision the following day, and the parties stipulated to stay the case on August 7, 2020.  Doc. 37.  The Second Circuit heard oral argument on this appeal on September 30, 2020, and directed the City to file a letter indicating whether it would enforce the limits on public gathering set forth in Geller's complaint.  Doc. 49 at 5.  On October 1, 2020, the City filed a public letter, which stated in relevant part:

> The City represents to the Court that it will not enforce the 50-person size limit on outdoor gatherings currently in effect with respect to plaintiff's planned protest activities, provided they are conducted consistently with plaintiff's representations throughout this lawsuit. In particular, plaintiff has affirmed that her planned protest(s) would be composed of approximately 25 to 100 people observing the required social distancing protocols—including standing six feet apart and wearing face coverings—and occur in a traditional public forum like City Hall Plaza.

*See* Doc. 48-2.

As discussed above, all COVID-19 related restrictions on public gatherings have been lifted as of June 15, 2021.  While COVID-19 infection rates have since risen due to the rise of the Delta variant, no gathering restrictions have been reinstated as of the date of this order.

## II.    Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted),

and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.   Discussion

### A.   The Parties' Mootness Arguments

The City has argued that Geller's claims for declaratory and injunctive relief against it are moot in light of its representation that it will not enforce the executive orders against her, at least for protests consistent with those described in her Complaint. *See* Doc. 49 at 8–9.[10] Geller has not disputed that her as-applied claims for declaratory and injunctive relief against the City are moot, but she maintains that the facial challenge is not moot. *See* Doc. 53 at 14 n.7. The City

---

[10] *See also* Doc. 48-2 (letter dated October 1, 2020). Because the Governor's order lifting all COVID-19 related gathering restrictions was issued after this matter was briefed, the parties do not address the impact of this order on whether Geller's claims for declaratory and injunctive relief against the state are moot.

did not respond to this point in its reply brief.  Geller also argues that the case as a whole is not

moot as to the Governor, a position that the Governor has not contested.  Finally, Geller also

brings claims for nominal damages against the City.  The Court will therefore analyze all of her

claims on their merits.  *See Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (a viable claim

for damages typically avoids mootness).

### B.  Geller's Facial Challenge to the Executive Orders is Collaterally Estopped

Collateral estoppel, also known as issue preclusion, applies where "(1) the issue in

question was actually and necessarily decided in a prior proceeding, and (2) the party against

whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first

proceeding."  *Levich v. Liberty Central School Dist.*, 361 F. Supp. 2d 151, 157 (S.D.N.Y. 2004)

(quoting *Colon v. Coughlin*, 58 F.3d 865, 869 n.2 (2d Cir. 1995)); *see also Wyly v. Weiss*, 697

F.3d 131, 140 (2d Cir. 2012) (issue preclusion "bars successive litigation of an issue of fact or

law actually litigated and resolved in a valid court determination essential to the prior judgment,

even if the issue recurs in the context of a different claim.") (citation and internal quotation

marks omitted).

The Governor first argues that Geller's facial challenge to the executive orders is

collaterally estopped based on Judge Cote's decision in *Geller I*.  In *Geller I*, Judge Cote

analyzed Mayor de Blasio's E.O. 103, prohibiting "any non-essential gathering of individuals of

any size for any reason."  Applying *Jacobson v. Massachusetts*, 97 U.S. 11 (1905), and

intermediate scrutiny, Judge Cote determined that E.O. 103 was "reasonable and narrowly

tailored."  *Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at *4.

Geller then filed this case, which challenges executive orders with identical operative

language to those challenged in *Geller I*, except that they permit gatherings of up to ten

individuals.  *See* E.O.s 115, 202.41.  The Court found that she had not shown a likelihood of

success on the merits of her facial First Amendment claim.  *See Geller II*, 476 F. Supp. 3d at 13.

The Court first reasoned that the claim was barred by collateral estoppel, noting that "[t]he issue

necessarily decided in *Geller I* is the same issue presented in this case:  whether, applying

intermediate scrutiny, the government's interest in protecting the public against the pandemic

outweighs Geller's First Amendment right to protest." [11]  *Id.* at 12–13.  Based on this common

issue, the Court determined that Geller's facial challenge was barred because "[t]he only

difference between her previous challenge and the instant one is that she is now challenging a

*less* restrictive order [than in *Geller I*]."  *Id.* (emphasis in original).  The reasoning of the Court's

decision in *Geller II* applies with full force here.  Geller is seeking to re-litigate the question of

whether an order prohibiting gatherings of up to ten people violates the First Amendment on its

face; however, Judge Cote already resolved this issue in *Geller I* when she found that a

substantially similar executive order prohibiting gathering *of any size* was constitutional.

Geller argues that collateral estoppel does not apply because of two factual developments

since *Geller I*.  First, she argues that Defendants' alleged preference for the speech of BLM

protestors constitutes evidence of "both content- and viewpoint-based distinctions."  Doc. 53 at

12.  Geller appears to be arguing that the challenged executive orders—which are indisputably

content-neutral on their face, *see Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at \*4, *Geller

II*, 476 F. Supp. 3d at 13—actually draw content-based distinctions and now must be analyzed

under the strict scrutiny standard, rather than through the lens of *Jacobson v. Massachusetts*, 97

U.S. 11 (1905) and intermediate scrutiny.  Geller also argues that the City's representation to the

---

[11] While *Geller I* and *Geller II* arose in the context of requests for preliminary injunctive relief, the parties in *Geller I* agreed to convert the decision to a final judgment.  Geller has not argued that the different procedural posture of this motion precludes the application of collateral estoppel.

Second Circuit that it will not enforce the executive orders against her is an "authoritative construction and stated practice" regarding the executive orders that renders them "woefully underinclusive, arbitrarily enforced, and as such, facially unconstitutional."  Doc. 53 at 13.

Geller's arguments are without merit.  As the Court explained in *Geller II*, on a facial challenge, a court generally "considers only the text of the [provision] itself, not its application to the particular circumstances of an individual."  476 F. Supp. 3d at 13 (citing *Field Day, LLC v. Cnty. Of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citations omitted).  On an as-applied challenge, on the other hand, the Court is required to examine the "facts of a particular case to decide if a facially constitutional statute 'deprived the individual to whom it was applied of a protected right.'"  *Id*. at 13 n.21 (citing *Field Day*, 463 F.3d at 174–75).  Geller correctly points out that, when reading a regulation in the context of a facial First Amendment challenge, a court may do so in light of any "binding judicial or administrative construction" thereof and consider "the well-established practice of the authority enforcing the ordinance."  *Id*. (citing *City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 770 n.11 (1988)).  However, Geller's reliance on this principle—which is typically applied in the context of challenges to laws such as licensing or permit schemes that, on their terms, provide public officials with unbridled discretion to control speech—is misplaced.

First, the City's representation that it will not enforce the gathering restrictions as to Geller is a discretionary enforcement determination, as Geller cites no authority to support her contention that the City's position is a "binding judicial or administrative construction" of the executive orders, such as one from a state's highest court.  Second, as the Court discussed in *Geller II*, several of the comments on which Geller relies to argue that Defendants favored BLM protesters were made in the context of volatile and novel enforcement scenarios:  For instance,

the Mayor and Governor's comments in the June 1, 2020 press release, *see* ¶ 51, occurred in the context of announcing citywide curfews keep gatherings and the potential for violence and destruction of property under control.  It is wholly implausible to conclude—as Geller suggests—that such comments made in response to "an immediate, spontaneous outpouring of righteous anger that reverberated around the globe" and resulted in tens of thousands of individuals taking to the streets is comparable to a well-established practice of favoritism of BLM's viewpoints, as opposed to an "acquiescing to the inevitability of [the protests]."  *See Geller II*, 476 F. Supp. 3d at 14.  Thus, these statements, as well as other events alleged by Geller such as former NYPD Chief Terrence Monahan's kneeling with protestors, are a far cry from a "well-understood and uniformly applied practice" of non-enforcement that has "virtually the force of a judicial construction."  *Cf. City of Lakewood*, 486 U.S. at 770 n.11.

Moreover, as this Court recently observed in another case raising a facial challenge to E.O. 103, agencies such as the New York City Department of Investigation have found that the NYPD's use of force and certain crowd control tactics to respond to the BLM protests "produced excessive enforcement that contributed to heightened tensions."  *See Butler v. City of New York*, No. 20 Civ. 4067 (ER), 2021 WL 4084501, at *8 (S.D.N.Y. Sept. 8, 2021) (quoting N.Y.C. Dep't of Investigation, Investigation into NYPD Response to the George Floyd Protests 3 (2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf); *see also* N.Y.A.G., Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd 9 (2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf (noting that the BLM protests occurred "against [the] backdrop" of allegations of "aggressive enforcement [of social distancing

rules] in communities of color," and describing widespread arrests of protestors in late May

2020).[12]  These facts further undermine any plausible inference of a City policy of favoritism

toward the BLM protestors.  Finally, to the extent Geller argues that the gathering restrictions

were issued with discriminatory intent and/or purpose, this position is without support:  The

original gathering restrictions—as well as their subsequent loosening to gatherings of ten

people—were issued before George Floyd's death sparked massive protest activity, and any

argument that such restrictions were passed to silence opposition to the very restrictions that are

being challenged is plainly circular.

Thus, none of the new facts available to the Court materially change its analysis that

Geller's facial challenge to the Executive Orders is collaterally estopped by Judge Cote's opinion

in *Geller I.*  Moreover, even if the Court were to analyze Geller's claim on its merits, it would

still fail, as discussed below.

**C.      Geller's Facial First Amendment Challenge Would Nevertheless Fail on the Merits**

**i.      The Applicable Standard of Review**

As discussed above and in *Geller I* and *II*, on a facial challenge, a court "considers only

the text of the [provision] itself, not its application to the particular circumstances of an

individual."  *See Field Day, LLC v. Cnty. Of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citing

*City of Lakewood*, 486 U.S. at 770 n.11).  All of the relevant gathering restrictions are facially

content-neutral because they expressly apply to all non-essential gatherings, without regard to

---

[12] "Agency determinations and administrative findings are public records of which a court may properly take judicial notice." *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012).  Indeed, de Blasio's statement in the June 1, 2020 press release appears to make reference to some of these incidents. *See* ¶ 51. ("The Police Commissioner and I have spoken at length about the incidents we've all seen in recent days where officers didn't uphold the values of this city or the NYPD.")

the messages conveyed by those gatherings.  *See Geller I*, ---F. Supp. 3d at ---, 2020 WL
2520711, at *4; *see also Geller II*, 476 F. Supp. 3d at 13.

The parties have framed their arguments on the merits around whether the Executive
Orders pass muster under the tiers of scrutiny framework.  However, as the Court recently held
in a case challenging the constitutionality of the City's E.O. 103, the framework established in
*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) governs the Court's analysis of this issue.  *See
Butler*, 2021 WL 4084501, at *6.[13]  In *Butler*, the Court analyzed E.O. 103 pursuant to *Jacobson*,
and applied intermediate scrutiny in the alternative.[14]  Accordingly, the Court will do so here.

### ii.  Jacobson v. Massachusetts

In *Jacobson*, the Supreme Court upheld a vaccination statute enacted by Massachusetts to
protect against smallpox.  197 U.S. at 38.  The Supreme Court held that a state or local law
"enacted to protect the public health" will survive judicial scrutiny unless it bears "no real or
substantial relation to [the public health], or is, beyond all question, a plain, palpable invasion of
rights secured by the fundamental law."  *Id.* at 31.  Although Jacobson "predated the modern
constitutional jurisprudence of tiers of scrutiny," *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620,
635 (2d Cir. 2020), "it has been likened to rational basis review," *Jones v. Cuomo*, No. 20 Civ.
4898 (KPF), --- F. Supp. 3d ---, 2021 WL 2269551, at *6 (S.D.N.Y. June 2, 2021).

---

[13] In doing so, the Court in *Butler* noted that, while the Supreme Court applied strict scrutiny to an executive order
regulating in-person religious services to combat the spread of COVID-19 in *Roman Catholic Diocese of Brooklyn
v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), it would join the majority of courts in this Circuit to find that the
holding of *Roman Catholic Diocese* was limited to Free Exercise claims and that it did not overrule *Jacobson*.  *See
Butler*, 2021 WL 4084501, at *5–6.  The Court abides by that determination here, as well as its determination that
the gathering restrictions challenged in this case are distinguishable from those in *Roman Catholic Diocese* because
they are content-neutral, as opposed to the more specific capacity restrictions on religious services challenged in
*Roman Catholic Diocese*.  *Id.* at *6.

[14] In *Geller I* and *Geller II*, both Judge Cote and this Court also applied both *Jacobson* and intermediate scrutiny.
*See Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at *3, *Geller II*, 476 F. Supp. 3d at 15–16.

As the Court held in *Butler* regarding E.O. 103, there can be no question that the Mayor's gathering restrictions were enacted to protect public health.  2021 WL 4084501, at *6.  This reasoning applies with full force to the Mayor's subsequent loosening of these restrictions through E.O. 115, which permitted gatherings of up to ten individuals as COVID-19 rates began to decline but still posed a substantial threat to public health.  The same holds true of the Governor's analogous gathering restrictions, which placed the same limitations on public gatherings.  As the Court further noted in *Butler*, "courts—as well as much of the public—are in agreement that COVID-19 is a highly infectious and potentially deadly disease."  *Id.* (quoting *Jones*, --- F. Supp. 3d at ---, 2021 WL 2269551, at *8).  And as the court in *Geller I* noted, the City first enacted the gathering restrictions "to slow the spread of a virus that ha[d at that time] hospitalized and killed tens of thousands of New Yorkers and infected hundreds of thousands more—in less than three months' time."  *Geller I*, --- F. Supp. 3d at ---, 2020 WL 2520711, at *4.

The Court also finds that Geller has not shown that E.O. 115—and by extension, the Governor's analogous E.O. 202.41 and the orders that preceded or extended these orders—bear no real or substantial relationship to the public health, or constituted plain, palpable invasions of rights secured by fundamental law.  *See Butler*, 2021 WL 4084501, at *6.  As the Court recently noted, although scientific understanding of how COVID-19 spreads has evolved, "the 'scientific and medical communities believe[d] that preventing in-person gatherings'—including outdoor ones—was 'crucial to any strategy of containment,' and courts in this District—including this one—agreed with that assessment, and the declining rates of infection following the enactment of [E.O. 103] validated that assessment at the time."  *Id.* (citations omitted); *see also Geller I*, --- F. Supp. 3d at ---, 2020 WL 2520711, at *4 ("The City has demonstrated that the scientific and

medical communities believe that preventing in-person gatherings is crucial to any strategy of containment.  As the City has argued, the declining rates of infection and death among New Yorkers is evidence not that the gatherings ban is overly broad, but rather that it is effective."); *Geller II*, 476 F. Supp. 3d at 15 (collecting cases in this and other circuits upholding COVID restrictions based on *Jacobson*).

Thus, while the Court will proceed to address the parties' arguments based on intermediate scrutiny in the alternative, it notes that the executive orders are constitutional through the lens of *Jacobson*.

### iii.    Tiers of Scrutiny

The parties dispute the appropriate level of scrutiny for Geller's facial challenge under the tiers of scrutiny framework.

In a forum traditionally open to the public—such as a public street or park—"the government's authority to regulate speech or expressive conduct is typically 'sharply circumscribed.'"  *Geller I*, --- F. Supp. 3d at ---, 2020 WL 2520711, at *3 (quoting *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005)).  "A prior restraint on speech, *i.e.*, any regulation that gives public officials the power to deny use of a forum in advance of actual expression ... bears a heavy presumption against its constitutional validity."  *Id.* (quoting *Hobbs*, 397 F.3d at 148).  A regulation restricting speech on the basis of content is analyzed under strict scrutiny review.  *Hobbs*, 397 F.3d at 148–49.  Under that standard, a content-based restriction may be upheld only if the restriction serves a compelling government interest, is necessary to serve the asserted compelling interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose.  *Id.* at 149.

Under intermediate scrutiny, the government may implement content-neutral regulations to "limit the time, place, or manner of expression—whether oral, written, or symbolized by conduct—even in a public forum, so long as the restrictions are 'reasonable,' are 'narrowly tailored to serve a significant governmental interest,' and 'leave open ample alternative channels for communication of the information.'"   *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see also Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012); *Geller II*, 476 F. Supp. 3d at 18.   Under the intermediate scrutiny standard, "narrowly tailored" does not require a regulation to be the "least restrictive or least intrusive means." *Marcavage*, 689 F.3d at 106 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)); *see also Hobbs*, 397 F.3d at 149.   Rather, the "regulation is narrowly tailored 'so long as [it] ... promotes a substantial government interest that would be achieved less effectively absent the regulation' and is 'not substantially broader than necessary.'" *Marcavage*, 689 F.3d at 106 (quoting *Ward*, 491 U.S. at 799–800).

Geller argues that the Executive Orders are subject to strict scrutiny because Defendants have "made their policy a speaker-based restriction."   Doc. 53 at 9 (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995)).   This argument mirror's Geller's collateral estoppel argument:   She alleges that Defendants have favored the viewpoint of the BLM protestors, and also cites to the City's own representation that it will not enforce the gathering restrictions if Geller organizes a protest in line with what she allegedly began to plan in early May 2020.

As a threshold matter, these arguments apply only to the City, as the Governor's position has been to defer to local officials regarding enforcement determinations.   *See* Doc. 55 at 3–4. The Court agrees with the Governor that the decision to defer to the City regarding enforcement

of the E.O.s is content neutral under these circumstances, especially given the variation in

COVID-19 rates in different parts of the state.  This decision is also consistent with public

officials' need for "flexibility to determine how to enforce the gathering restrictions, [and] to

determine the circumstance under which arrest may or may not be appropriate."  *See Geller II*,

476 F. Supp. 3d at 10.  However, in any event, for the same reasons discussed above in the

collateral estoppel context, Geller's allegations raise no plausible inference that either the Mayor

or the Governor has adopted a policy favoring the viewpoint of the BLM protestors, so as to

support a finding that the executive orders are content-based regulations.  *Id.* at 13–14 (rejecting

the argument that the E.O.s are content-based because there was no evidence of a policy of

encouraging BLM protests); *Butler*, 2021 WL 4084501, at *8 (analogizing to the Court's

discussion in *Geller II* to conclude that the plaintiffs pleaded no policy of viewpoint

discrimination regarding E.O. 103, given the "drastically different circumstances" surrounding

the arrests of the *Butler* plaintiffs and the BLM protests).  The Court also notes that, as discussed

previously, Geller has not plausibly alleged that the executive orders were passed with the intent

to target speech critical of COVID-19 restrictions.

Geller also argues that the City's representation that it will not enforce the gathering

restrictions against her is evidence of a "new policy of non-enforcement of the executive orders

against individuals, like Plaintiff, who sue."  Doc. 53 at 9.  Setting aside the fact that "individuals

. . . who sue" does not describe a particular viewpoint, Geller cites to no authority showing that a

single representation of the intent to exercise prosecutorial discretion is sufficient to transform a

facially content-neutral statute into one that is content-based.  In any event, her Complaint does

not allege any facts that plausibly support this new "individuals . . . who sue" theory.[15]  Thus,

---

[15] This theory is also inconsistent with her allegations of a policy of favoring the speech of BLM protestors.  For
example, she has not alleged that any lack of enforcement as to them followed a lawsuit, and "individuals . . .who

there is no basis for the Court to depart from its prior opinions that—if analyzed under the traditional tiers of scrutiny—the Executive Orders would be subject to intermediate scrutiny, and not strict scrutiny.  *See Geller II*, 476 F. Supp. 3d at 12 n.20; *see also Butler*, 2021 WL 4084501, at *8.

Applying intermediate scrutiny to the E.O.s, the Court concludes, as it did in *Geller II* and *Butler*, that they are constitutional.  First, as the Court has previously noted, combatting the spread of COVID-19 is a substantial government interest.  Indeed, as of the date of this order, approximately 684,488 Americans have suffered COVID-19-related deaths.  *See* Coronavirus in the U.S.: Latest Map and Case Count, The New York Times (updated Sept. 24, 2021), https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited Sept. 24, 2021).  The Court thus turns to the question of whether the restriction is narrowly tailored under the intermediate scrutiny standard.

The Court has no trouble concluding, as it did in *Geller II* and *Butler*, and as Judge Cote did in *Geller I*, that the executive orders were appropriately tailored.  As the Court noted in *Geller II*, the gathering restrictions were imposed "to mitigate the harm and spread of the pandemic, which would be 'achieved less effectively' absent [the restrictions]."  476 F. Supp. 3d. at 16 (citing *Hobbs*, 397 F.3d at 149).  In *Geller II*, the Court relied on several cases noting that the gathering restrictions had been effective in helping to reduce the spread of COVID-19 in summer 2020.  *See McCarthy v. Cuomo*, No. 20 Civ. 2124 (ARR), 2020 WL 3286530, at *4 (E.D.N.Y. June 18, 2020) ("I agree with Judge Cote's analysis that prohibitions on large public gatherings and other similar restrictions are narrowly tailored to the interest of protecting the public from COVID-19."); *Geller I*, --- F. Supp. 3d at ---, 2020 WL 2520711, at *4 (noting that

---

sue" could—and in this case, does—include individuals like Geller who do not necessarily share the viewpoint of the BLM protestors.

"the declining rates of infection and death among New Yorkers is evidence not that the gatherings ban is overly broad, but rather that it is effective.").  Indeed, the Court recently reaffirmed this analysis in *Butler*, noting that the "subsequent loosening of the gathering restrictions . . . [which were] tied to improving infection rates across the city and state, are evidence that [E.O. 103] was narrowly tailored, as the restriction was temporary."  2021 WL 4084501, at *9.  The restrictions challenged by Geller, of course, are even less restrictive than E.O. 103.

The only new argument proffered by Geller is that the City's granting of "exceptions" to the BLM protestors (and to her), is evidence that the orders create a free speech restriction that is "underinclusive," and therefore they cannot be narrowly tailored.  Doc. 53 at 9.  However, Geller relies only on cases in which exceptions to a statute were either underinclusive on their face, or where there was an established policy of underinclusive enforcement.  *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 46 (1994) (a city's ordinance restricting residential signs included ten exemptions);  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (City ordinance banning animal sacrifice failed under strict scrutiny because it purported to regulate cruelty to animals but instead targeted almost exclusively religious sacrifice);  *Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (denying summary judgment when the defendant "made no effort (of any kind) to respond" to evidence that it permitted prison lockdowns to facilitate medical appointments and other routine inmate transportation, but not for the plaintiff's transportation to a sweat lodge for his religious practice).  Here, however, the gathering restrictions prohibit "any non-essential gathering of individuals . . . for any reason."  *See, e.g.*, E.O. 115.  This definition cannot reasonably be read as underinclusive, as it applies to routine gatherings such as weddings and other social events, nor—as described in detail above—has

Geller alleged facts supporting the existence of an enforcement policy to punish her viewpoint of opposing COVID-19 restrictions.[16]

Finally, there is no basis for the Court to depart from its previous determination that the Executive Orders permit adequate alternative means for protestors like Geller to articulate their message. As Judge Cote stated in *Geller I*, '[t]he plaintiff is free to express her discontent online, through media, and by protesting in public on her own." *Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at \*4; *see also Geller II*, 476 F. Supp. 3d at 16 (same). These observations are as true today as they were last summer. Geller's facial challenge to the executive orders therefore must fail.

### D.     Geller's As-Applied Challenge Fails to State a Claim

#### i.     Geller's As-Applied Challenge is Not Ripe

In *Geller II*, the Court held that Geller did not have standing to bring an as-applied challenge because "she never even attempted to apply for a permit for her planned protest" and "abandoned [her plans to organize a protest] before any interaction with the police." 476 F. Supp. at 17. On this basis, the Court found that "no threats of enforcement of the gathering restrictions have ever been made against her." *Id.*

In the instant motion, the parties have generally taken the same position on this issue as they did in *Geller II*: The Governor has argued that Geller cannot bring an as-applied suit as a pre-enforcement challenge, citing to *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of New York*, 852

---

[16] Geller also appears to make a void for vagueness argument in her opposition brief. Doc. 53 at 10–11. This allegation was not properly pleaded because it was not set forth in her complaint. However, it would also fail for the same reason the plaintiffs' void for vagueness claim failed in *Butler*: The Mayor's E.O. 115 incorporates the State's definition of "essential," which therefore makes clear what is "non-essential" and provides adequate guidelines for enforcement. *See Butler*, 2021 WL 4084501, at \*11. Moreover, the fact that the City represented it will not enforce the executive orders as to Geller is of no relevance to whether the E.O.s themselves are void for vagueness.

F.3d 178 (2d Cir. 2017).  In *Jacoby & Meyers*, a law firm challenged the constitutionality of the restriction on investments in law firms by non-lawyers under the New York Code of Professional Conduct and certain New York statutes.  *Id.* at 182–83.  The Second Circuit affirmed the District Court's dismissal of the claim, holding that "[b]ecause plaintiffs pursue this pre-enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied challenge."  *Id.* at 184 (quoting *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted)).

Geller, on the other hand, relies on *Steffel v. Thompson*, 415 U.S. 452 (1974), in which the Supreme Court permitted an as-applied pre-enforcement challenge.  In *Steffel*, police officers twice threatened to arrest the plaintiff and his partner for distributing handbills on a sidewalk in protest of the Vietnam War.  *Id*. at 455.  The plaintiff left to avoid arrest, but the parties stipulated that if the plaintiff "returned and refused upon request to stop handbilling, a warrant would be sworn out and he might be arrested and charged with a violation of the Georgia statute."  *Id*. at 456.  The Supreme Court held that, under those circumstances, "it is not necessary that [he] first expose himself to actual arrest or prosecution" to seek a declaratory judgment that the trespass statute was unconstitutional as applied to him.  *Id.*  Geller also relies on several other cases in which as-applied, pre-enforcement challenges were permitted.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (holding that plaintiffs who faced a "credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (citation and quotation marks omitted).

As the Court acknowledged in *Geller II*, there is some tension between *Jacoby* and *Steffel* and *Holder*.  However, there have been no intervening facts or changes in law to merit a departure from the Court's prior assessment that Geller's allegations do not rise even to the level

of a "credible threat" of prosecution or enforcement.  *See Geller II*, 476 F. Supp. 3d at 17.  In

addition to Geller's failure to allege that she applied for a permit or took any other preparatory

steps, the Court in *Geller II* also relied on the fact that "the City has represented that no

enforcement or prosecution has been made of individuals solely for protesting peacefully as

violations of the gathering restrictions since the Floyd-related demonstrations began."  *Id.* at 18

(noting also that any arrests in connection with the BLM protests were made for other reasons,

and that Geller had represented that the protest would be "peaceful and in compliance with social

distancing protocols.").  The Court found that this lack of enforcement action concerning the

gathering restrictions—combined with relevant enforcement guidance in place that "enforcement

should only be used as a last resort"—further cut against Geller's allegations of a credible threat

of prosecution.  *Id.*  These observations still apply with full force, and Geller has alleged no new

facts that change the Court's prior assessment.

### ii.      Geller's As-Applied Claim Would Fail on the Merits

Even if Geller had standing to assert her as-applied claim, it would fail on the merits.  As

discussed above, Geller's as-applied challenge is subject to intermediate scrutiny.  *See Geller II*,

476 F. Supp. 3d at 12 n.20; *see also Butler*, 2021 WL 4084501, at *8.  The Court acknowledges,

as it did in *Geller II*, that she has adequately pleaded that her planned protest would have

involved political speech protected by the First Amendment.  However, such speech is "subject

to reasonable time, place, and manner regulations that are content-neutral, serve a significant

government interest, and that leave open ample alternative channels for communication of the

information."  *Geller II*, 476 F. Supp. 3d at 18.  Here, as discussed in detail above, the gathering

restrictions are content neutral, extending to non-essential gatherings "for any reason."  *See, e.g.*,

E.O. 115, *see also Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at *4 (noting that an earlier

E.O., which was substantially identical except for the size of gathering permitted, was content-neutral).  Moreover, the parties have not disputed the importance of the government interest of combatting COVID-19.

The Court also finds, consistent with the consensus in this Circuit, that the gathering restrictions are narrowly tailored to meet this interest.  *See Geller I*, ---F. Supp. 3d at ---, 2020 WL 2520711, at *4 (finding that more restrictive orders on any gathering passed intermediate scrutiny); *McCarthy v. Cuomo*, No. 20 Civ. 2124 (ARR), 2020 WL 3286530, at *4 (E.D.N.Y. June 18, 2020) ("I agree with Judge Cote's analysis that prohibitions on large public-gatherings and other similar restrictions are narrowly tailored to the interest of protecting the public from COVID-19."); *Geller II*, 476 F. Supp. 3d at 15–16 (finding the gathering restrictions narrowly tailored); *Butler*, 2021 WL 4084501, at *9 (the gathering restrictions were narrowly tailored because they permitted plaintiffs to protest on their own, or convey their messages online or through other media).  As discussed above, the City and State have gradually loosened the restrictions over the course of this litigation in response to declining infection rates, evidencing both that the restrictions were effective in meeting their goals and that they were temporary. Indeed, Geller appears to have acknowledged that this was Defendants' intent in her own complaint.  *See* ¶ 45 ("Upon information and belief, Defendants Cuomo and de Blasio intend to lessen or increase the 'shut down' and thus First Amendment restrictions in the future depending upon their respective views of the severity of the COVID-19 infection, hospitalization, and mortality rates in New York.").

Moreover, as discussed above, the restrictions have left open alternative channels of communication, such as smaller gatherings of individuals or online channels such as social media.  This latter option is particularly salient for Geller:  As the Court noted in *Geller II*, Geller

is a published author and popular blogger whose "substantial online presence and following undercuts her contention that a protest of between 25 to 100 people is the most effective way for her to express her point of view." *Geller II*, 476 F. Supp. 3d at 16.[17]  Geller's as-applied challenge therefore fails.

### E. Geller Fails to Plead a Plausible Selective Enforcement Challenge

As the Court noted in *Geller II*, "to the extent Geller bases her as-applied challenge on a claim that the gathering restrictions are applied to her in a discriminatory fashion against her First Amendment protected views, that challenge 'coalesce[s]' with her selective enforcement Equal Protection claim."  476 F. Supp. 3d at 19 (*citing Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).

To state a selective enforcement Equal Protection claim, a plaintiff must plausibly allege: (1) that she, compared with others similarly situated, was "selectively treated"; and (2) that such "selective treatment" was based on "impermissible considerations" including, among other things, "intent to inhibit or punish the exercise of constitutional rights."  *Bar-Levy v. Gerow*, No. 18 Civ. 9454 (NSR), 2020 WL 814925, at *5 (S.D.N.Y. Feb. 19, 2020) (citing *Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017)).  To satisfy the first prong, a plaintiff must identify a "similarly situated comparator," and show that she was treated differently compared with that comparator. *Id.*  Among courts in this Circuit, it is unsettled whether selective enforcement cases require a high degree of similarity, or whether a "slightly less stringent" standard applies wherein plaintiffs must show that the comparators are "similarly situated in all material respects."

---

[17] To this point, the Court in *Geller II* took judicial notice of the fact that she had a significant online presence, with—at the time of the Court's August 3, 2020 Opinion—1,289,034 followers on Facebook, over 200,000 followers on Twitter, 108,000 followers on Instagram,  and 28,900 followers on YouTube, and that she has used these channels to express public discontent about COVID-19 restrictions regularly.  *See Geller II*, 476 F. Supp. 3d at 6, 19 n.26.  Moreover, Geller did not dispute the City's contention that she had not—at least as of the date of the City's moving brief—actually held a demonstration of the sort that was contemplated in her complaint.

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008)).

Geller fails to state a selective enforcement claim for several reasons.  First—for substantially the same reasons that she faced no credible threat of prosecution—her claim is not ripe and she has otherwise failed to allege that she was "treated differently" from the BLM protestors.  *Bishop v. Best Buy, Co., Inc.*, No. 08 Civ. 8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010).  That is:  Geller has not alleged that she actually engaged in group protest activity—nor has she alleged that she engaged in any concrete pre-enforcement activity that could give rise to differential treatment.  *Cf. Tara Circle, Inc. v. Bifano*, No. 95 Civ. 6522 (DLC), 1997 WL 399683, at *13–14 (S.D.N.Y. July 15, 1997) (holding, in the zoning context, that the plaintiffs' claims were unripe because defendants had not engaged in any adverse enforcement of the zoning laws against them).  The crux of Geller's selective enforcement allegations are that Defendants permitted the BLM protestors to demonstrate, and that, if she had demonstrated, she would have been treated differently from them.  ¶¶ 59, 85.  But this is not the same as an allegation that she actually *was* treated differently, and Geller fails to allege differential treatment at any stage in the planning process for her contemplated demonstrations.  Indeed, she provides no detail about any steps at all, aside from the conclusory assertion that she "was planning to protest throughout the months of May and June, and possibly as long as the restrictions continued . . . ." but cancelled such plans following Defendants' May 4 press conference.  ¶ 47.  Because Geller "abandoned [any plans to protest] before any interaction with the police"—or indeed, any interaction with other City or State officials—"no threats of enforcement of the gathering restrictions have ever been made against her."  *See Geller II*, 476 F.

Supp. 3d at 17.  And for the same reasons, she has alleged no facts supporting her allegation that she was "den[ied] use [of a public forum]" by Defendants.  *See* ¶ 85.

Second, Geller also fails to state a selective enforcement claim for the independent reason that she alleges no facts about the BLM protestors that suggest they are similarly situated to her, under any standard.  While determination of whether a "comparator" is similarly situated is ordinarily a question of fact, a plaintiff must still plausibly allege that they were treated differently from others similarly situated.  *See Bishop*, 2010 WL 4159566, at *11–12.  Here, she has not done so.  Geller acknowledges that "sparked by the death of George Floyd while in police custody in Minneapolis Minnesota, beginning on May 28, 2020 . . . hundreds and thousands of protestors have taken to the streets of New York City."  ¶ 49.  As the Court noted in its preliminary injunction determination, these protests were both spontaneous and enormous, and—although largely peaceful—they nevertheless created fast-moving and volatile enforcement situations, as some turned violent, leading Defendants to issue the Citywide curfew announcements upon which Geller relies.  *See Geller II*, 476 F. Supp. 3d at 14; *see also* ¶¶ 51–52.[18]  Indeed, as Geller acknowledges, these curfews required "doubling the NYPD presence across the city."  ¶ 51.  While Geller never held any protest, she alleges that her anticipated protest "was to include between 25 and 100 people standing silently with face coverings, observing social distancing protocols, and holding signs conveying their protest message."  ¶ 56. Thus—even if her claims were ripe—her allegations nevertheless suggest that her demonstration would have differed significantly from the BLM protests in size, spontaneity, and due to its centralized organization.  As the Court noted in *Geller II*, these factors were relevant to the

---

[18] Some estimates have suggested that the protests nationwide constituted the largest protest movement in United States history.  *See* Larry Buchanan et al., Black Lives Matter May Be the Largest Movement in U.S. History, The New York Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html (last visited September 23, 2020).

City's enforcement of the BLM protests, as "it is not difficult to imagine that if robust efforts were made to enforce the gathering restrictions in response to the Floyd demonstrations, an already fraught and combustible situation would have been made worse." 476 F. Supp. 3d at 14. Thus, the Court cannot plausibly find that she is in a position "roughly equivalent" to the BLM protestors so as to support a selective enforcement claim. *See Abel v. Morabito*, No. 04 Civ. 7284 (PGG), 2009 WL 321007, at *5 (S.D.N.Y. Feb. 11, 2009).[19]

Third, Geller has not plausibly alleged that any alleged differences in treatment were motivated by impermissible considerations. As discussed in detail in *Geller II*, it is simply implausible to read Defendants' statements as "encouraging" the violation of the gathering restrictions—particularly with regard to the statements made in connection with the imposition of a citywide curfew to control the very protests Geller alleges were favored. 476 F. Supp. 3d at 13–14; *see also id.* at 19 ("[N]othing in Defendants' public statements remotely suggest an attempt to suppress viewpoints against gathering restrictions, or that Defendants permit only protests expressing messages that they favor."). In her opposition brief, Geller also relies on ¶ 39 of her complaint, which alleges that another "small group of protestors" were instructed by the NYPD to disband and "threatened by the police with summonses and arrest" if they failed to do so, as evidence of selective enforcement. *See* Doc. 53 at 15–16; ¶ 39. However, this Court has already rejected a similar argument brought by protestors who were arrested for violating E.O. 103 at a protest of approximately twenty people criticizing Defendants' COVID-19 response. *See Butler*, 2021 WL 4084501, at *8 (noting that "Plaintiffs fail to establish that Defendants favored the message of [the BLM] protestors," and citing, *inter alia*, the N.Y.C. Department of

---

[19] In her opposition brief, Geller argues that the two different groups of protestors are "BLM protestors versus *all others*, including Plaintiff—protesting publicly." Doc. 53 at 17 (emphasis added). But Geller does not allege that she herself ever "protest[ed] publicly," so this theory fails to meet the necessary pleading requirement that *she*—as opposed to someone else—was treated differently from the BLM protestors.

Investigation Report).  Moreover, the Court emphasized the "drastically different circumstances" of the *Butler* plaintiffs and BLM protestors, and the need for flexibility regarding enforcement strategies in light of the extraordinary nature of the BLM protests.  *Id.* (citing *Geller II*, 476 F. Supp. 3d at 14).  These observations apply with full force to Geller's present arguments. Furthermore, Geller's other allegations that Defendants have used the gathering restrictions to "silence . . . opposition to their respective policies so that they can retain their political power," *see* ¶ 70, is wholly conclusory, particularly against the backdrop of an undeniably deadly pandemic that killed tens of thousands in New York.

Finally, the Court notes that Geller has not alleged any specific enforcement actions taken by the Governor.  Geller's single allegation about non-BLM protestors being asked to disperse— which is the only allegation of differential treatment against non-BLM protestors contained in her complaint—states only that "Defendants de Blasio and Shea" enforced the executive orders against these protestors.  ¶ 39.  While Geller argues in her opposition brief that the Governor nonetheless retains the *power* to enforce these restrictions (by, for example, directing the State Police to make arrests) she does not allege that the Governor or State Police actually took such action against other protestors.  Rather, Geller's only specific allegation about the Governor's alleged favoritism of BLM protestors is the press release announcing the temporary curfew— which is insufficient to state a claim for the reasons already discussed.[20]  Thus, even if Geller could state a claim based on her general allegations regarding the City's enforcement against non-BLM protestors, such a claim would only be stated against the City.  *Cf. Illinois Republican Party v. Pritzker*, 470 F. Supp. 3d 813, 822 (N.D. Ill. 2020) (holding, in the First Amendment

---

[20] Geller also references other statements made to the press by then-Governor Cuomo in the days following George Floyd's death that the Court considered in *Geller II*.  *See* 476 F. Supp. 3d at 9–10.  However, these statements are merely consistent with the statements alleged in the Complaint and do not materially change the Court's analysis regarding the unique enforcement issues posed by the BLM protests.

context, that the "[p]laintiffs have failed to point to a single instance in which they, or anyone similarly situated, protested with political messages and *state officials* enforced the Order against them because of this content. Thus, the Court has no basis by which to evaluate whether the Governor has selectively enforced the Order.") (emphasis in original).

### F.    Qualified Immunity

Because there was no constitutional violation, the Court need not determine whether qualified immunity applies. *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (noting that a court may determine whether a constitutional violation is adequately alleged before it decides whether a defendant is shielded by qualified immunity).

### G.    Commissioner Shea's Personal Involvement

The City has also argued that claims against Commissioner Shea must be dismissed because Geller does not plead that Shea was personally involved in any alleged constitutional violations. Doc. 49 at 25.  Geller failed to respond to this argument in her opposition brief, and has thus waived any argument that Shea should be held liable under § 1983 for personal involvement. *See Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16 Civ. 7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) (holding that a plaintiff's failure to address an argument in its opposition constitutes a waiver of the argument); *see also Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").  The City's motion as to Shea is therefore granted on this basis as well.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in their entirety and this case is dismissed with prejudice.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 47 and 50, and enter judgment for Defendants.

It is SO ORDERED.

Dated:  September 24, 2021
        New York, New York

_____
        Edgardo Ramos, U.S.D.J.